**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 19-1952**

———————

GAVIN GRIMM,

Plaintiff – Appellee,

v.

GLOUCESTER COUNTY SCHOOL BOARD,

Defendant – Appellant.

------------------------------

NAACP LEGAL DEFENSE AND EDUCATION FUND, INC.; INTERACT: ADVOCATES FOR INTERSEX YOUTH; FAIRFAX COUNTY SCHOOL BOARD; ALEXANDRIA CITY SCHOOL BOARD; ARLINGTON SCHOOL BOARD; FALLS CHURCH CITY SCHOOL BOARD; TREVOR PROJECT; NATIONAL PARENT TEACHER ASSOCIATION; GLSEN; AMERICAN SCHOOL COUNSELOR ASSOCIATION; NATIONAL ASSOCIATION OF SCHOOL PSYCHOLOGISTS; PFLAG, INC.; TRANS YOUTH EQUALITY FOUNDATION; GENDER SPECTRUM; GENDER DIVERSITY; CAMPAIGN FOR SOUTHERN EQUALITY; HE SHE ZE AND WE; SIDE BY SIDE; GENDER BENDERS; AMERICAN ACADEMY OF PEDIATRICS; AMERICAN ACADEMY OF CHILD AND ADOLESCENT PSYCHIATRY; AMERICAN ACADEMY OF PHYSICIAN ASSISTANTS; AMERICAN COLLEGE OF PHYSICIANS; AMERICAN MEDICAL ASSOCIATION; AMERICAN MEDICAL STUDENTS ASSOCIATION; AMERICAN MEDICAL WOMEN'S ASSOCIATION; AMERICAN NURSES ASSOCIATION; AMERICAN PSYCHIATRIC ASSOCIATION; AMERICAN PUBLIC HEALTH ASSOCIATION; ASSOCIATION OF MEDICAL SCHOOL PEDIATRIC DEPARTMENT CHAIRS; GLMA: HEALTH PROFESSIONALS ADVANCING LGBT EQUALITY; LBGT PA CAUCUS; PEDIATRIC ENDOCRINE SOCIETY; SOCIETY FOR ADOLESCENT HEALTH AND MEDICINE; SOCIETY FOR PHYSICIAN ASSISTANTS IN PEDIATRICS; WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH; LEAH FREGULIA; ADELITA

GRIJALVA; DAVID VANNASDALL, Ed.D.; LOS ANGELES UNIFIED
SCHOOL DISTRICT; JUDY CHIASSON, Ph. D.; MONICA GARCIA; WENDY
RANCK-BUHR, Ph. D.; SAN DIEGO UNIFIED SCHOOL DISTRICT;
ELDRIDGE GREER, Ph. D.; GREGORY R. MEECE; FRANKLIN NEWTON,
Ed.D.; DIANA K. BRUCE; DANIEL F. GOHL; DENISE PALAZZO; JEREMY
MAJESKI; KAREN CARNEY; SARAH SHIRK; BETH BAZER, Ed.D.; PAULA
INSLEY MILLER, Ed.D.; THOMAS WEBER; THOMAS A. ABERLI, Ed.D.;
HOWARD COLTER; MATTHEW HANEY; KEN KUNIN; ROBERT A.
MOTLEY; CATHERINE FROM; ROGER BOURGEOIS; CYNDY TAYMORE;
LIZBETH DESELM; DYLAN PAULY; DELOIS COOKE SPRYSZAK; CRAIG
MCCALLA; MARY DORAN; WASHOE COUNTY SCHOOL DISTRICT;
JAMES C. MORSE, SR., Ed.D.; THE SCHOOL DISTRICT OF SOUTH ORANGE
AND MAPLEWOOD; THOMAS SMITH, Ed.D.; CRAIG VAUGHN; ARTHUR
DIBENEDETTO; LAS CRUCES PUBLIC SCHOOLS; WENDI MILLER-
TOMLINSON, M.D., Ph.D.; JOHN O'REILLY; HEIDI CARTER; ANTHONY
GATTO; ERIC DOSS; PEYTON CHAPMAN; ZIAD W. MUNSON, Ph. D.;
RACHEL SANTA, Ed.D.; KELLIE M. HARGIS, Ed.D.; LINDSEY POLLOCK,
Ed.D.; BRIAN SCHAFFER; THE WASHINGTON CENTRAL UNIFIED UNION
SCHOOL DISTRICT; WILL BAKER; LISA LOVE; SHERIE HOHS; SHERRI
CYRA; LAURA H. LOVE, Ed.D.; JILL GURTNER; MONICA SCHOMMER;
BRYAN DAVIS, Ph. D.; PARU SHAH, Ph. D.; TIM KENNEY; STATE OF NEW
YORK; STATE OF WASHINGTON; STATE OF CALIFORNIA; STATE OF
COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE
OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF
MARYLAND; STATE OF MASSACHUSETTS; STATE OF MICHIGAN; STATE
OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF
NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON;
COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND;
STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; DISTRICT OF
COLUMBIA,

Amici Supporting Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at
Newport News. Arenda L. Wright Allen, District Judge. (4:15-cv-00054-AWA-RJK)

Argued: May 26, 2020                               Decided: August 26, 2020
Amended: August 28, 2020

Before NIEMEYER, WYNN, and FLOYD, Circuit Judges.

2

————————————

Affirmed by published opinion. Judge Floyd wrote the majority opinion, in which Judge Wynn joined. Judge Wynn wrote a concurring opinion. Judge Niemeyer wrote a dissenting opinion.

————————————

**ARGUED:** David Patrick Corrigan, HARMAN CLAYTON CORRIGAN & WELLMAN, Richmond, Virginia, for Appellant. Joshua A. Block, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellee. **ON BRIEF:** Jeremy D. Capps, M. Scott Fisher, Jr., George A. Somerville, HARMAN CLAYTOR CORRIGAN & WELLMAN, Richmond, Virginia, for Appellant. Eden B. Heilman, Jennifer Safstrom, Nicole Tortoriello, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia; Leslie Cooper, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellee. Sherrilyn A. Ifill, President and Director-Counsel, Janai S. Nelson, Samual Spital, Jin Hee Lee, Kevin E. Jason, New York, New York, Christopher Kemmitt, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., Washington, D.C.; Suzanne B. Goldberg, COLUMBIA LAW SCHOOL SEXUALITY AND GENDER LAW CLINIC, New York, New York, for Amicus NAACP Legal Defense & Educational Fund, Inc. Aron Fischer, Jonah M. Knobler, PATTERSON BELKNAP WEBB & TYLER LLP, New York, New York, for Amicus interACT: Advocates for Intersex Youth. Stuart A. Raphael, Sona Rewari, Washington, D.C., Trevor S. Cox, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Amici Fairfax County School Board and Other Virginia School Boards. Howard S. Hogan, Washington, D.C., Abbey Hudson, Corey G. Singer, Keshia Afia Bonner, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California, for Amicus The Trevor Project. Wesley R. Powell, Mary Eaton, WILLKIE FARR & GALLAGHER LLP, New York, New York, for Amici The National PTA, GLSEN, American School Counselor Association, and National Association of School Psychologists. Asaf Orr, Shannon Minter, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco, California; Lynly Egyes, TRANSGENDER LAW CENTER, Oakland, California; Maureen P. Alger, John C. Dwyer, Palo Alto, California, Kyle Wong, Audrey J. Mott-Smith, COOLEY LLP, San Francisco, California, for Amici PFLAG, Inc, Trans Youth Equality Foundation, Gender Spectrum, Gender Diversity, Campaign for Southern Equality, He She Ze and We, Side by Side, and Gender Benders. Aaron M. Panner, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC, Washington, D.C.; Devi M. Rao, Washington, D.C., Ethan C. Wong, JENNER & BLOCK LLP, New York, New York, for Amici Medical, Public Health, and Mental Health Organizations. Richard M. Segal, San Diego, California, Cynthia Cook Robertson, Robert C.K. Boyd, William C. Miller, PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C.; Tara L. Borelli, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Atlanta, Georgia, for Amici School Administrators from Twenty-Nine States and the District of Columbia. Robert W. Ferguson, Attorney General, Noah G. Purcell, Solicitor General,

Alan D. Copsey, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington.  Letitia James, Attorney General, Barbara D. Underwood, Solicitor General, Anisha S. Dasgupta, Deputy Solicitor General, Linda Fang, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York.  Xavier Becerra, Attorney General, OFFICE OF THE ATTORNEY GENERAL, Sacramento, California, for Amicus State of California.  Phil Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of California.  William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut.  Kathy Jennings, Attorney General, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, for Amicus State of Delaware.  Clare E. Connors, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAII, Honolulu, Hawaii, for Amicus State of Hawaii. Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine.  Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland.  Maura Healey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts.  Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Amicus State of Michigan.  Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota.  Aaron D. Ford, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Carson City, Nevada, for Amicus State of Nevada.  Gubrir S. Grewal, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey.  Hector H. Balderas, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico, for Amicus State of New Mexico. Joshua H. Stein, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH CAROLINA, Raleigh, North Carolina, for Amicus State of North Carolina.  Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon.  Josh Shapiro, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF PENNSYLVANIA, Harrisburg, Pennsylvania, for Amicus Commonwealth of Pennsylvania.  Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island.  Thomas J. Donovan, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont.  Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia.  Karl A. Racine, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia.

FLOYD, Circuit Judge:

At the heart of this appeal is whether equal protection and Title IX can protect transgender students from school bathroom policies that prohibit them from affirming their gender. We join a growing consensus of courts in holding that the answer is resoundingly yes.

Now a twenty-year-old college student, Plaintiff-Appellee Gavin Grimm has spent the past five years litigating against the Gloucester County School Board's refusal to allow him as a transgender male to use the boys restrooms at Gloucester County High School. Grimm's birth-assigned sex, or so-called "biological sex," is female, but his gender identity is male. Beginning at the end of his freshman year, Grimm changed his first name to Gavin and expressed his male identity in all aspects of his life. After conversations with a school counselor and the high school principal, Gavin entered his sophomore year living fully as a boy. At first, the school allowed him to use the boys bathrooms. But once word got out, the Gloucester County School Board (the "Board") faced intense backlash from parents, and ultimately adopted a policy under which students could only use restrooms matching their "biological gender."

The Board built single-stall restrooms as an "alternative" for students with "gender identity issues." Grimm suffered from stigma, from urinary tract infections from bathroom avoidance, and from suicidal thoughts that led to hospitalization. Nevertheless, he persevered in his transition; he underwent chest reconstruction surgery, received a state-court order stating that he is male, and amended his birth certificate to accurately

reflect his gender. But when he provided the school with his new documentation, the Board refused to amend his school records.

Grimm first sued in 2015, alleging that, as applied to exclude him from the boys bathrooms, the Board's policy violated the Equal Protection Clause of the Fourteenth Amendment and constituted discrimination on the basis of sex, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). Since then, Grimm amended his complaint to add that the Board's refusal to amend his school records similarly violates both equal protection and Title IX. In 2019, after five winding years of litigation, the district court finally granted Grimm summary judgment on both claims. It awarded Grimm nominal damages, declaratory relief, attorney's fees, and injunctive relief from the Board's refusal to correct his school records. The Board timely appealed. Agreeing with the district court's considered opinion, we affirm.

## I. Background

### A.

To be sure, many of us carry heavy baggage into any discussion of gender and sex. With the help of our amici and Grimm's expert, we start by unloading that baggage and developing a fact-based understanding of what it means to be transgender, along with the implications of gendered-bathroom usage for transgender students.

Given a binary option between "Women" and "Men," most people do not have to think twice about which bathroom to use. That is because most people are cisgender, meaning that their gender identity—or their "deeply felt, inherent sense" of their gender—

6

aligns with their sex-assigned-at-birth. *See* Br. of Amici Curiae Med., Pub. Health, & Mental Health Orgs. in Supp. of Pl.-Appellee 4–5 (hereinafter "Br. of Medical Amici") (primarily relying on Am. Psychol. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832 (2015)).[1] But there have always been people who "consistently, persistently, and insistently" express a gender that, on a binary, we would think of as opposite to their assigned sex. *See id.* at 8; *see also* J.A. 174–75 (Dr. Penn Expert Report & Decl. at 3–4).

Such people are transgender, and they represent approximately 0.6% of the United States adult population, or 1.4 million adults. *See* Br. of Medical Amici 5. Just like being cisgender, being transgender is natural and is not a choice. *See id.* at 7.

Being transgender is also not a psychiatric condition, and "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *See id.* at 6 (quoting Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Variant Individuals* (2012)); *see also* Br. of Amicus Curiae the Trevor Project in Supp. of Pl.-Appellee 4 (hereinafter "Br. of Trevor Project") (explaining that the World Health Organization also declassified being transgender as a mental illness).

---

[1] Amici curiae party to this brief include the following seventeen leading medical, public health, and mental health organizations: American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of PAs, American College of Physicians, American Medical Association, American Medical Students Association, American Medical Women's Association, American Nurses Association, American Psychiatric Association, American Public Health Association, Association of Medical School Pediatric Department Chairs, GLMA: Health Professionals Advancing LGBTQ Equality, LBGT PA Caucus, Pediatric Endocrine Society, Society for Adolescent Health and Medicine, Society for Physician Assistants in Pediatrics, and World Professional Association for Transgender Health.

However, transgender people face major mental health disparities: they are up to three times more likely to report or be diagnosed with a mental health disorder as the general population, Am. Med. Ass'n & GLMA: Health Professionals Advancing LGBTQ Equality, *Issue Brief: Transgender Individuals' Access to Public Facilities* 2 (2018), and nearly *nine times* more likely to attempt suicide than the general population, *see* Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 114 (Dec. 2016) (hereinafter "USTS Report").

Moreover, many transgender people are clinically diagnosed with gender dysphoria, "a condition that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." Br. of Medical Amici 9; *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 768–69 (9th Cir. 2019). Gender dysphoria is defined in the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders. "[T]o be diagnosed with gender dysphoria, the incongruence [between gender identity and assigned sex] must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning." *See* J.A. 175 (Dr. Penn Expert Report & Decl. at 4); *see also* Br. of Medical Amici 9 (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451–53 (5th ed. 2013) (hereinafter "DSM-5")). Incongruence between gender identity and assigned sex must be manifested by at least two of the following markers:

> (1) "[a] marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics";

(2) "[a] strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender";

(3) "[a] strong desire for the primary and/or secondary sex characteristics of the other gender";

(4) "[a] strong desire to be of the other gender";

(5) "[a] strong desire to be treated as the other gender"; or

(6) "[a] strong conviction that one has the typical feelings and reactions of the other gender."

*See* DSM-5 at 452 (J.A. 1117).

Puberty is a particularly difficult time for transgender children, who "often experience intensified gender dysphoria and worsening mental health" as their bodies diverge further from their gender identity. Br. of Medical Amici 10. Left untreated, gender dysphoria can cause, among other things, depression, substance use, self-mutilation, other self-harm, and suicide. *Id.* at 11. Being subjected to prejudice and discrimination exacerbates these negative health outcomes. *Id.* at 11.

For many years, mental health practitioners attempted to convert transgender people's gender identity to conform with their sex assigned at birth, which did not alleviate dysphoria, but rather caused shame and psychological pain. *Id.* at 11–12. Fortunately, we now have modern accepted treatment protocols for gender dysphoria. Developed by the World Professional Association for Transgender Health (WPATH), the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (7th Version 2012) (hereinafter "WPATH Standards of Care") represent the consensus approach of the medical and mental health community, Br. of Medical Amici 13, and have

been recognized by various courts, including this one, as the authoritative standards of care,

*see De'lonta v. Johnson*, 708 F.3d 520, 522–23 (4th Cir. 2013); *see also Edmo*, 935 F.3d

at 769; *Keohane v. Jones*, 328 F. Supp. 3d 1288, 1294 (N.D. Fla. 2018), *vacated sub nom.*

*Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020).[2]  "There are no other

competing, evidence-based standards that are accepted by any nationally or internationally

recognized medical professional groups."  *Edmo*, 935 F.3d at 769 (quoting *Edmo v. Idaho*

*Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125 (D. Idaho 2018)).[3]

---

[2]  To be sure, some courts have held in the Eighth Amendment deliberate-indifference context that there remains medical disagreement as to the necessity of sex reassignment surgery (SRS), which the WPATH Standards of Care include as a treatment necessary for *some* patients. *See Gibson v. Collier*, 920 F.3d 212, 219–20 (5th Cir. 2019); *Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014) (discussing one expert's dismissal of the WPATH Standards of Care as they pertain to SRS, and later holding that prison officials were not deliberately indifferent when presented with "two alternative treatment plans" by "competent professionals"). *But see Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1017 (W.D. Wis. 2019) (explaining that the record in *Kosilek* was developed in 2006, "at which time medical experts disagreed" as to the necessity of SRS for Kosilek, and that the Fifth Circuit in *Gibson* was not presented with new record evidence, but rather relied on the same 2006 evidentiary record in *Kosilek*).  We need not offer an opinion one way or the other.

[3]  That did not prevent the Board from finding an expert, Dr. Quentin Van Meter, who disagrees with the WPATH Standards of Care, and who treats transgender youth by encouraging them to live in accordance with their sex assigned at birth.  It goes without saying that one can always find a doctor who disagrees with mainstream medical professional organizations on a particular issue.  Aspects of Dr. Van Meter's report blatantly contradict the views of Grimm's expert, as well as the American Academy of Pediatrics and our other medical amici.  On appeal, however, the Board relies on Dr. Van Meter's testimony only for its assertion that Grimm remained biologically female.  *See* Opening Br. 12, 27, 46.  The Board does not assert that Dr. Van Meter's report creates any genuine factual questions that would impact our legal analysis below.  Therefore, we need not consider the remainder of his assertions, and may rely on the overwhelming evidence regarding the accepted standards of care.

The WPATH Standards of Care outline appropriate treatments for persons with gender dysphoria, including "[c]hanges in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity)," hormone treatment therapy, sex reassignment surgery, "[s]urgery to change primary and/or secondary sex characteristics," and psychotherapy "for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience." *See* J.A. 200–01 (WPATH Standards of Care 9–10). "The number and type of interventions applied and the order in which these take place may differ from person to person," J.A. 200 (WPATH Standards of Care 9), and special considerations are taken before adolescents are provided with physical transition treatments such as hormone therapy, J.A. 209–212 (WPATH Standards of Care 18–21).

There is no question that there are students in our K-12 schools who are transgender. For many of us, gender identity is established between the ages of three and four years old. Br. of Medical Amici 7. Thus, some transgender students enter the K-12 school system as their gender; others, like Grimm, begin to live their gender when they are older. By the time youth are teenagers, approximately 0.7% identify as transgender. That means that there are about 150,000 transgender teens in the United States. That is not to suggest that people are either cisgender or transgender, and that everyone identifies as a binary gender of male or female. Of course, there are other gender-expansive youth who may identify as nonbinary, youth born intersex who do or do not identify with their sex-

11

assigned-at-birth, and others whose identities belie gender norms. *See generally PFLAG*, *PFLAG National Glossary of Terms* (July 2019), http://pflag.org/glossary (explaining that "transgender" is "also used as an umbrella term to describe groups of people who transcend conventional expectations of gender identity or expression"). But today's question is limited to how school bathroom policies implicate the rights of transgender students who "consistently, persistently, and insistently" express a binary gender.

Transgender students face unique challenges in the school setting. In the largest nationwide study of transgender discrimination, the 2015 U.S. Transgender Survey (USTS), 77% of respondents who were known or perceived as transgender in their K-12 schools reported harassment by students, teachers, or staff. Br. of Amici Curiae Sch. Adm'rs from Twenty-Nine States & D.C. in Supp. of Pl.-Appellee 6 (hereinafter "Br. of School Administrator Amici") (citing USTS Report at 132–35). For such students who were known or perceived to be transgender:

- 54% reported verbal harassment;

- 52% reported that they were not allowed to dress in a way expressing their gender;

- 24% reported being physically attacked because people thought they were transgender;

- 20% believed they were disciplined more harshly because teachers or staff thought they were transgender;

- 13% reported being sexually assaulted because people thought they were transgender; and

- 17% reported having left a school due to severe mistreatment.

USTS Report at 11. Unsurprisingly, then, harassment of transgender students is also correlated with academic success: students who experienced greater harassment had significantly lower grade point averages. Br. of School Administrator Amici 11. And harassment at school is similarly correlated with mental health outcomes for transgender students. The opposite is also true, though: transgender students have better mental health outcomes when their gender identity is affirmed. *See* Br. of Trevor Project 8.

Using the school restrooms matching their gender identity is one way that transgender students can affirm their gender and socially transition, but restroom policies vary. In one survey, 58% of transgender youth reported being discouraged from using the bathroom that corresponds with their gender. *See id*. When being forced to use a special restroom or one that does not align with their gender, more than 40% of transgender students fast, dehydrate, or find ways not to use the restroom. Br. of Amici Curiae the Nat'l PTA, GLSEN, Am. Sch. Counselor Ass'n, and Nat'l Assoc. of Sch. Psychologists in Support of Pl.-Appellee 5 (hereinafter "Br. of Education Association Amici") (citing Joseph Kosciw et al., GLSEN, *The 2017 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* 14 (2018)). Such restroom avoidance frequently leads to medical problems. *See id*. at 16 (citing Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives*, 19 J. Pub. Mgmt. & Soc. Pol'y 65, 74–75 (2013)). To respond to the needs of transgender students, school districts across the country have implemented policies that allow transgender students to use the restroom matching their gender identity, and they have done so without incident. *See generally* Br.

of School Administrator Amici; Br. of Education Association Amici; Br. of Fairfax Cty. Sch. Bd. & Other Va. Sch. Bds. as Amici Curiae in Support of Appellee and in Favor of Affirmance (hereinafter "Br. of Virginia School Board Amici").

B.

With that essential grounding, we turn to the facts of this case. In so doing, we recount the district court's factual findings, adding only undisputed facts from the record when helpful to our analysis.

When Gavin Grimm was born, he was identified as female, and his sex so indicated on his birth certificate. But Grimm always knew that he was a boy. For example, when given the choice, he would opt to wear boys' clothing. He recounts how uncomfortable he was when made to wear a dress to a sibling's wedding. Grimm also related to male characters, and he felt joy whenever he was "mis"-identified as a male—whether by an adult lining children up in "boy-girl" fashion, or by a good friend who recognized that Grimm was male. At the time, though, Grimm did not have the language to describe himself as transgender.

In September 2013, Grimm began attending Gloucester High School, a public high school in Gloucester County, Virginia. He was enrolled as a female.

In April 2014, during Grimm's freshman year, he disclosed to his mother that he was transgender. At Grimm's request, he began therapy the following month with Dr. Lisa Griffin, Ph.D., a psychologist with experience counseling transgender youth. Dr. Griffin diagnosed Grimm with gender dysphoria. Dr. Griffin then prepared a treatment

14

documentation letter stating that Grimm had gender dysphoria, that he should present as a male in his daily life, that he should be considered and treated as a male, and that he should be allowed to use restrooms consistent with that identity. Dr. Griffin also referred Grimm to an endocrinologist for hormone treatment.

By the end of his freshman year, Grimm was out to his whole family, had changed his first name to Gavin, and was expressing his male identity in all aspects of his life. He used male pronouns to describe himself. He even used men's restrooms when in public, with no incidents or questions asked.

In August 2014, before the beginning of Grimm's sophomore year, Grimm and his mother met with a school guidance counselor, Tiffany Durr, to discuss his transition. They gave Durr a copy of Dr. Griffin's treatment documentation letter and requested that Grimm be treated as a boy at school. At the time, the student bathrooms were all multi-stalled and single-sex—i.e., boys and girls bathrooms. Those bathrooms were located throughout the school. The only other options were apparently a restroom located in the nurse's office, and the faculty restrooms. Grimm agreed to use the restroom in the nurse's office. But once school started, he "soon found it stigmatizing to use a separate restroom" and "began to feel anxiety and shame surrounding [his] travel to the nurse's office." J.A. 113 (Gavin Grimm Decl. at ¶ 29). He also realized that using the restroom in the nurse's office caused him to be late to class because of its location in the school.

After a few weeks of using the nurse's office, Grimm met with Durr again and asked for permission to use the boys restrooms. Durr asked the high school principal, Principal Collins, who spoke with the Superintendent, Dr. Clemons. The Superintendent deferred to

15

Principal Collins's judgment, and Principal Collins allowed Grimm to use the male restrooms. At that time, the Board was not yet involved. Grimm was given permission to complete his physical education courses online and never needed to use the locker rooms at school.

For seven weeks, Grimm used the boys restrooms at Gloucester County High School without incident. Despite that smooth transition, adults in the community caught wind of the arrangement and began to complain. Superintendent Clemons, Principal Collins, and Board members began receiving numerous complaints via email and phone not only from adults within that school district but also from adults in neighboring communities and even other states. Only one student personally complained to Principal Collins, and that student did so before the restroom privacy improvements discussed below.

Following these complaints, Board member Carla Hook, who had expressed her opposition to having a transgender male in the boys bathrooms, proposed the following policy at the Board's public meeting on November 11, 2014:

> Whereas the [Gloucester County Public Schools (GCPS)] recognizes that some students question their gender identities, and
>
> Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and
>
> Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore
>
> It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

16

J.A. 775.  Neither the Board nor the school informed either Grimm or his family that Grimm's bathroom usage would be up for debate at that Board meeting.  Rather, news of the topic for the meeting spread on Facebook, and Grimm's mother found out from a friend the day before.  Grimm and his parents attended the meeting, at which twenty-four other community members spoke.

Although some community members supported creating a separate restroom for Grimm, by and large, they vehemently opposed allowing Grimm to use the boys restrooms. Two common themes arose: (1) that the "majority" must be protected from such minority intrusion, *see, e.g.*, *School Board Meeting*, Gloucester County School Board (Nov. 11, 2014), at 14:48–15:20 (hereinafter, "November Meeting"), http://gloucester.granicus.com/ player/clip/1065?view_id=10 ("It is a disruption. . . . [W]e have more to consider than just the rights of one student. . . . what about the rights of other students, the majority of the students at Gloucester High School."), *cited by* Opening Br. 11 n.2; *id.* at 18:57–19:06 ("While we have an obligation to provide minority rights, we still are a majority rule country . . . ."), and (2) that allowing transgender students to use the bathroom matching their gender identity would open the door to predatory behavior, particularly by male students pretending to be transgender in order to use the girls bathroom, *see, e.g.*, *id*. at 14:27–14:39 ("When we have a situation with a young man that says they want to identify themselves as a young lady and they go in . . . the ladies' room with ill intent, where does it end?"); *id.* at 20:57–21:02 ("A young man can come up and say, 'I'm a girl, I need to use the ladies' rooms now.' And they'd be lying through their teeth.").

The Board was set to vote on the proposed policy at that very meeting but voted 4-3 to delay the vote.  Come the next meeting, held on December 9, 2014, the comment period was even uglier.  One person called Grimm a "freak" and likened him to a dog, asking: "must we use tax dollars to install fire hydrants where you can publicly relieve yourselves?"  *School Board Meeting*, Gloucester County School Board (Dec. 9, 2014), at 1:22:54–1:23:34, http://gloucester.granicus.com/ player/clip/1090?view_id=10, *cited by* Opening Br. 11 n.3.  Another likened Grimm to a "European" asking for a "bidet."  *Id.* at 1:40:45–1:40:48.  More than one person talked about Grimm's gender identity as a choice.  *See id.* at 1:13:58–1:14:09 ("Is it morally right for us to kneel or bow to the very few who demand that they receive a special identification to meet needs of their own perceived body functions?"); *id.* at 1:18:48–1:19:49 (woman discussing her "former" lesbianism as an "addiction" from which "Jesus Christ set [her] free").  And more than one citizen stated that they would vote out the Board members if they allowed Grimm to use the boys restroom.  *See id.* at 42:21–42:32, 50:53–50:56, 1:18:00–1:18:05.

At both meetings, Grimm and his parents spoke out against the proposed policy.  Grimm explained in part how "alienating" and "humiliating" it had been to use the nurse's office, and that it "took a lot of time away from [his] education."  November Meeting at 24:36–24:58.  He also explained that he was currently using the men's public restrooms in Gloucester County without "any sort of confrontation of any kind."  *Id.* at 25:05–25:26.

The Board passed the proposed policy on December 9, 2014 by a 6-1 vote.  The following day, Principal Collins sent a letter to Grimm explaining that he was no longer

18

allowed to use the boys bathrooms, effective immediately, and that his further use of those bathrooms would result in disciplinary consequences.

As a corollary to the policy, the Board approved a series of updates to the school's restrooms to improve general privacy for all students. The updates included the addition or expansion of partitions between urinals in male restrooms, the addition of privacy strips to the doors of stalls in all restrooms, and the construction of three single-stall unisex restrooms available to all students.

At the same time that the bathroom policy was going into place in December 2014, Grimm began hormone therapy. Hormone therapy "deepened [his] voice, increased [his] growth of facial hair, and [gave him] a more masculine appearance." J.A. 120 (Gavin Grimm Decl. ¶ 60). But until the single-stall bathrooms were completed, Grimm's only option was to use the girls bathrooms or the restroom in the nurse's office. Grimm recalls an incident when he stayed after school for an event, realized the nurse's office was locked, and broke down in tears because there was no restroom he could use comfortably. A librarian witnessed this and drove him home. In a similar vein, and even after the single-user restrooms had been built, Grimm could not use those restrooms when at football games. He recounts a friend having to drive him to a hardware store to use the restroom; on another occasion, his mother had to come pick him up early.

The single-stall restrooms were completed on December 16, 2014, one week after the Board enacted the policy. Once completed, however, they were located far from classes that Grimm attended. A map of the school confirms that no single-user restrooms were located in Hall D, where Grimm attended most classes.

Moreover, the single-stall restrooms made Grimm feel "stigmatized and isolated." J.A. 117 (Gavin Grimm Decl. ¶ 47). He never saw any other student use these restrooms. J.A. 117 (Gavin Grimm Decl. ¶ 48). Principal Collins testified at his deposition that he never saw a student use the single-user restrooms, but that he assumed that they were used because they were cleaned daily.

As commonly occurs for transgender students prohibited from using the restroom matching their gender identity, *see supra* Part I.A, Grimm practiced restroom avoidance. This caused Grimm to suffer from recurring urinary tract infections, for which his mother kept medication "always stocked at home." J.A. 133 (Deirdre Grimm Decl. ¶ 26).

During his junior year, Grimm was hospitalized for suicidal ideation resulting from being in an environment where he felt "unsafe, anxious, and disrespected." J.A. 119 (Gavin Grimm Decl. ¶ 54). In a moment of affirmation, the hospital admitted him to the boys ward. The situation at Gloucester County High School had proved untenable for him, and he sought other schooling options. Grimm spent his junior year in a Gloucester County High School program in a separate building. But that program was cancelled, and he had to return to the same restroom situation for his senior year. Having collected credits in the prior program, he spent as little time at the high school as possible during his senior year.

At the same time, Grimm's gender transition progressed. In June 2015, before his junior year, the Virginia Department of Motor Vehicles issued Grimm state identification reflecting that he was male. In June 2016, Grimm underwent chest reconstruction surgery

(a double mastectomy).[4]  The Gloucester County Circuit Court found this to be a type of "gender reassignment surgery," and on September 9, 2016, it issued an order declaring that Grimm is "now functioning fully as a male" and directing the Virginia Department of Health to issue him a birth certificate accordingly.  Grimm's new birth certificate was issued on October 27, 2016.

Shortly thereafter, Grimm and his mother provided Gloucester County High School with his new birth certificate and asked that his school records be updated to reflect his gender as male.  The decision of whether to amend Grimm's records accordingly, though, lay with the Board.  In January 2017, through legal counsel, the Board informed Grimm in a letter that it declined to update his records.  The Board did not provide a reason, but did inform Grimm of his right to a hearing, which Grimm did not request.

As part of this litigation, the Board's 30(b)(6) witness, Troy Andersen, testified that the Board refused to update Grimm's records because, in its view, Grimm's amended birth certificate was not issued in accordance with Virginia law and because it was marked "void."  Grimm submitted a declaration from State Registrar and Director of the Division of Vital Records Janet Rainey, who administers Virginia's vital records.  Rainey affirmed the validity of Grimm's birth certificate, stating: "On October 27, 2016, I issued a birth certificate to Gavin Elliot Grimm.  The birth certificate states his sex as male."  J.A. 982 (Decl. of Janet M. Rainey).

---

[4] The parties agree that Grimm could not have undergone gender confirmation surgery of the genitalia until he was at least eighteen years old.

Grimm graduated high school on June 10, 2017. He now attends community college in California and intends to transfer to a four-year university. To do so, he will need to provide his high school transcript, which still identifies him as female.

## II. Procedural History

The procedural history of this case is winding and has outlasted Grimm's high school career, shaping both the claims and relief sought. Grimm first sued the Board on June 11, 2015, at the end of his sophomore year. Grimm alleged that the Board's restroom policy impermissibly discriminated against him in violation of both Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. As relief, he sought compensatory damages and an injunction allowing him to use the boys restrooms. Although the Board's policy similarly applies to locker room facilities, Grimm did not need to use the locker rooms and never challenged that aspect of the policy. Because he only challenges his exclusion from the boys restrooms, we refer to the policy as the "bathroom" or "restroom" policy throughout.

The Board filed a motion to dismiss Grimm's claims. In the first ruling in Grimm's case, the district court denied Grimm's motion for a preliminary injunction and dismissed his Title IX claim, holding that it would not defer to a Guidance Document issued by the Department of Education's Office for Civil Rights (OCR), which, at that time, directed in part that "[u]nder Title IX, a recipient must generally treat transgender students consistent with their gender identity . . . ." *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 132

F. Supp. 3d 736, 746 (E.D. Va. 2015).  The district court held that an implementing regulation of Title IX, 34 C.F.R. § 106.33, "clearly allows the School Board to limit bathroom access 'on the basis of sex,' including birth of biological sex."  *Id.*

Grimm filed an interlocutory appeal, and this Court reversed, holding that the Guidance Document was entitled to deference.  *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 715 (4th Cir. 2016).  However, after that decision, the Department of Education and Department of Justice withdrew its prior Guidance Document, issuing a new one.  Accordingly, the Supreme Court, which had granted the Board's petition for writ of certiorari and had scheduled oral arguments, summarily vacated this Court's decision and remanded for reconsideration in light of the shift in agency perspective.  *See Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*, 137 S. Ct. 1239 (2017).

Having graduated from high school, Grimm then filed an amended complaint, which was assigned to a different district court judge.  The amended complaint did not seek compensatory damages—only nominal damages and declaratory relief.[5]  It also adjusted Grimm's Title IX claim in time to extend throughout his time at Gloucester County High School.  Finally, it incorporated more recent factual developments, including that Grimm underwent chest reconstruction surgery, had his sex legally changed under Virginia law by the Gloucester County Circuit Court, and received a new birth certificate from the Department of Health, listing his sex as male.  The Board once again filed a motion to dismiss for failure to state a claim.  In an opinion that would build the basis for summary

---

[5] Initially, the amended complaint retained Grimm's request for a permanent injunction, but Grimm voluntarily dismissed that request.

judgment, the district court denied the Board's motion to dismiss.  As to Grimm's Title IX claim, the district court held that "claims of discrimination on the basis of transgender status are per se actionable under a gender stereotyping theory," and that Grimm had sufficiently pleaded sex discrimination that harmed him.  *See Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 746–47 (E.D. Va. 2018) (quoting *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 715 (D. Md. 2018)).  As to his equal protection claim, the district court held that heightened scrutiny applied both because "transgender individuals constitute at least a quasi-suspect class," and because Grimm pleaded a sex-stereotyping claim.  *Id*. at 749–50.  And the policy could not withstand heightened scrutiny, the district court reasoned, because it was not substantially related to the government's interest in protecting the privacy of other students.  *See id*. at 751 (explaining that Grimm used the boys bathroom without incident until adults complained, that transgender students are not more likely than others to peep, and that pre-pubescent and post-pubescent children share bathrooms without issue).  Students enjoyed the added privacy of partitions installed in the boys bathroom, and if any students felt that the partitions were insufficient, *they* could use the single-stalled bathrooms.  *See id*.  But to tell Grimm alone that he could not use the multi-stalled boys bathrooms "singled out and stigmatized" him.  *Id*.

After this win, Grimm filed a second amended complaint, adding a claim that the Board's refusal to update his gender on his school transcripts violates Title IX and equal protection.  Grimm and the School Board then filed cross-motions for summary judgment.  Again, the district court ruled in Grimm's favor, granting him summary judgment on both his Title IX and equal protection claims.

Grimm filed various exhibits in support of his motion, including medical treatment records and letters documenting his treatment. The district court rejected the Board's Motion to Strike these exhibits, holding that the authoring doctors were not being treated as expert witnesses, and that they were business records falling within a hearsay exception. The district court did grant the Board's Motion to Strike as to one piece of evidence, however. In February 2019, the Board had considered a new policy "that would allow transgender students to use restrooms consistent with their gender identity if certain criteria were met." *Grimm v. Gloucester Cty. Sch. Bd.*, 400 F. Supp. 3d 444, 455–56 (E.D. Va. 2019). The district court found that this policy was inadmissible because it was considered as a part of settlement negotiations. *Id.*

On the merits, and applying its prior Title IX holding as further supported by additional intervening caselaw, the district court granted Grimm's Motion for Summary Judgment on the Title IX claim. In doing so, it rejected the Board's contention that Grimm failed to prove harm, *see infra* Section V, because Grimm's declaration under oath explained that going to the bathroom was like a "walk of shame," and because he suffered urinary tract infections from trying to avoid the bathroom and was even hospitalized for suicidal thoughts. *See id.* at 458. This was enough to prove that he was harmed; he did not need expert testimony. *See id.*

The district court also granted Grimm's Motion for Summary Judgment on his equal protection claim, again finding more intervening support for its prior holding. The Board had presented a witness by deposition, Troy Andersen, who testified that using the toilet or urinal implicates students' privacy concerns. However, "[w]hen asked why the

25

expanded stalls and urinal dividers could not fully address those situations, Mr. Andersen responded that he 'was sure' the policy also protected privacy interests in other ways, but that he "[couldn't] think of any other off the top of [his] head.'" *See id.* at 461 (alterations in original). Therefore, the district court found that the Board's privacy argument was "based upon sheer conjecture and abstraction.'" *See id.* (quoting *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017)).

Regarding Grimm's school records, the Board had argued that Grimm's amended birth certificate did not comply with Virginia law. But according to the district court, any question of compliance was "dispelled by the Declaration of Janet M. Rainey," the State Registrar and Director of the Division of Vital Records, who issued Grimm's amended birth certificate. *See id.* at 458. The court went on to declare that the Board's "continued recalcitrance" to fix his school records violated both Title IX and equal protection, and it issued a permanent injunction ordering the Board to correct Grimm's school records. *Id.*

In addition to declaratory relief, the district court awarded nominal damages to Grimm in the amount of one dollar for the Board's Title IX and equal protection violations, as well as attorney's fees. The Board timely appealed.

### III. The Board's Threshold Challenges to Grimm's Claims

At the outset, we reject the Board's two threshold challenges to Grimm's claims on appeal: (1) that his claims pertaining to the restroom policy are moot, and (2) that his claims pertaining to his school records must be administratively exhausted.

A.  Mootness of Challenge to Restroom Policy

First, the Board contends that we lack jurisdiction over Grimm's challenges to the restroom policy because those claims are mooted by his own amendments to the complaint, which removed his request for injunctive relief and compensatory damages.  As characterized by the Board, by only seeking nominal damages and declaratory relief as to the restroom policy, "Grimm seeks nothing more than a judicial stamp of approval, which is not a proper remedy."  Reply Br. 1.  Finding a live controversy, we reject this argument.

Our jurisdiction is restricted by Article III of the Constitution to "Cases" and "Controversies."  *See Chafin v. Chafin*, 568 U.S. 165, 171 (2013).  A case becomes moot and jurisdiction is lost if, at any time during federal judicial proceedings, "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"  *See id*. at 172 (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). But the bar for maintaining a legally cognizable claim is not high: "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *See id*. (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)).  Naturally, then, plausible claims for damages defeat mootness challenges.  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019) ("If there is any chance of money changing hands, [the] suit remains live."); *see also* 13C Charles Alan Wright et al., Federal Practice and Procedure § 3533.3 (3d ed. April 2020 Update) (hereinafter "Wright & Miller").

That is true even when the claim is for nominal damages.  *See* Wright & Miller § 3533.3, n.47 (collecting cases); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. City of*

*New York*, 140 S. Ct. 1525, 1536 (2020) (Alito, J., dissenting) (same). Under this Circuit's precedent, "even if a plaintiff's injunctive relief claim has been mooted, the action is not moot if the plaintiff may be 'entitled to at least nominal damages.'" *Rendelman v. Rouse*, 569 F.3d 182, 187 (4th Cir. 2009) (quoting *Covenant Media of S.C., LLC v. City of N. Charleston,* 493 F.3d 421, 429 n.4 (4th Cir. 2007)). And the implications are particularly important in the civil rights context, because such rights are often vindicated through nominal damages. *See N.Y. State Rifle & Pistol Ass'n, Inc.*, 140 S. Ct. at 1535 (Alito, J., dissenting) (citing *Riverside v. Rivera*, 477 U.S. 561, 574 (1986) (plurality opinion)); *see also Riverside*, 477 U.S. at 574 (plurality opinion) ("Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards.").[6]

Nevertheless, the Board analogizes to an Eleventh Circuit en banc decision, *Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs*, 868 F.3d 1248, 1263 (11th Cir. 2017). But *Flanigan's Enterprises* is unpersuasive because it is not on point.

In *Flanigan's Enterprises*, the Eleventh Circuit held that the plaintiff-appellants' request for declaratory and injunctive relief from a city ordinance became moot when the City repealed that ordinance "unambiguously and unanimously, in open session," with

---

[6] Additionally, winning nominal damages under 42 U.S.C. § 1983 allows for a recovery of attorney's fees under 42 U.S.C. § 1988, thereby allowing plaintiffs with insufficient funds to hire an attorney at market rate, and with little prospect of a great recovery, to be matched with a civil rights attorney. *See generally Riverside*, 477 U.S. at 576–80 (plurality opinion) (discussing the importance of the § 1988 framework for vindicating civil rights). Holding that claims for nominal damages are moot would undermine this framework by discouraging attorneys from taking cases such as Grimm's.

28

"persuasive reasons for doing so." 868 F.3d at 1263. The City had "expressly, repeatedly, and publicly disavowed any intent to reenact [the challenged] provision," which it had "*never* enforced in the first place." *Id*. (emphasis added). The Eleventh Circuit then turned to the appellants' "lone" remaining request, nominal damages. It explained that, in some situations, nominal damages have a "practical effect" or are the "appropriate remedy"; in others, nominal damages "would serve no purpose other than to affix a judicial seal of approval to an outcome that has already been realized." *Id*. at 1264. *Flanigan's Enterprises* was "squarely of that last variety," the court said, because the appellants had "already won." *Id*.

*Flanigan's Enterprises* is distinct at every turn. Whereas the ordinance at issue in that case had never been enforced, and had been publicly retracted, here the Board unquestionably applied its policy against Grimm. To this day, the Board and Grimm "vigorously contest" the legality of the bathroom policy as applied to Grimm. *See Chafin*, 133 S. Ct. at 1024 (holding that a case was not moot when the parties continued to "vigorously contest the question of where their daughter w[ould] be raised"). Unlike the Eleventh Circuit in *Flanigan's Enterprise*, we are presented with a "live controversy," *Hall v. Beals*, 396 U.S. 45, 48 (1969), that is "likely to be redressed by a favorable judicial decision," *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). As seen by this drawn-out litigation, it will *only* be redressed by a favorable judicial decision.

29

B.  Administrative Exhaustion of School Records Decision

Second, the Board asserts that Grimm was required to exhaust his administrative remedies by requesting a hearing after he learned of the Board's final decision.  "Where relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts; and until that recourse is exhausted, suit is premature and must be dismissed."  *Reiter v. Cooper*, 507 U.S. 258, 269 (1993).  The Board is correct that the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g, under which Grimm requested that his records be amended, provides for a hearing.  *See* 34 C.F.R. § 99.20(c) ("If the educational agency or institution decides not to amend the record as requested, it shall inform the parent or eligible student of its decision and of his or her right to a hearing under § 99.21.").  When read together with broader agency principles, the Board believes that FERPA's regulatory hearing provision demands exhaustion.

In sharp contrast to a statute like the Prison Litigation Reform Act of 1995 (PLRA), which demands "proper exhaustion," *see Woodford v. Ngo*, 548 U.S. 81, 93 (2006), the FERPA says nothing about exhausting administrative remedies.  *Cf.* PLRA, 42 U.S.C. § 1997e(a) ("No action shall be brought . . . until such administrative remedies as are available are exhausted.").  Facing Congressional silence, rather than an express exhaustion provision, "sound judicial discretion governs."  *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded on other grounds by statute*, 42 U.S.C. § 1997e(a).

Even when considering a different education statute with an *explicit* exhaustion requirement, the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415(l),

the Supreme Court held that its exhaustion requirement is not implicated when the gravamen of the suit is disability discrimination in violation of other federal laws, rather than a more direct violation of the IDEA itself.  *See Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017).  And here, the "gravamen" of Grimm's suit is discrimination, rather than technical violations of the FERPA.  *See Fry*, 137 S. Ct. at 755.[7]  Grimm is not complaining that the Board failed to follow the FERPA, but rather that it acted in a discriminatory manner when it refused to amend his records.

We may ask ourselves what benefit a hearing could have provided Grimm, when the Board continues to deny his request in the face of both a court order stating that his sex is male and a declaration from the State Registrar affirming the validity of his new birth certificate.  If the FERPA ever *implicitly* demands such complete exhaustion, it does not do so in a discrimination case such as this one.

## IV.  Grimm's Equal Protection Claim

Holding that Grimm's challenges to the bathroom policy are not moot, and that he need not have strictly exhausted his administrative remedies as to his school records, we turn to the merits of his claims, beginning with his constitutional claim that both the

---

[7] The Board cites one case that, in its view, suggests that FERPA has an exhaustion requirement.  But that case holds only that the student must at least provide the school with documentation of a gender change before suing.  *See Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 663 (W.D. Pa. 2015) (rejecting transgender student's claims arising out of the school's failure to amend his records because the student had not presented a court order or birth certificate, and never followed through).

31

restroom policy and the failure to amend his school records violated equal protection, as applied to him.

We address the Board's two challenged actions in turn. In doing so, we review the district court's grant of summary judgment to Grimm de novo. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). Summary judgment is only appropriate when there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." *Ret. Comm. of DAK Ams. LLC v. Brewer*, 867 F.3d 471, 479 (4th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).

### A. The Board's Restroom Policy

To analyze Grimm's as-applied constitutional challenge to the Board's restroom policy, we must begin with the equal protection framework. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause protects us not just from state-imposed classifications, but also from "intentional and arbitrary discrimination." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (quoting *Sioux City Bridge Co. v. Dakota Cty.*, 260 U.S. 441, 445 (1923)); *see also* Jack M. Balkin & Reva B. Siegel, *The American Civil Rights Tradition: Anticlassification or Antisubordination?*, 58 U. Miami L. Rev. 9 (2003) (explaining that the Equal Protection Clause contains both anticlassification and antisubordination principles). Put another way,

state action is unconstitutional when it creates "arbitrary or irrational" distinctions between classes of people out of "a bare . . . desire to harm a politically unpopular group." *Cleburne*, 473 U.S. at 446–47 (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)); *see also United States v. Virginia*, 518 U.S. 515, 534 (1996) (sex-based classifications "may not be used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women" (citation omitted)).

When considering an equal protection claim, we first determine what level of scrutiny applies; then, we ask whether the law or policy at issue survives such scrutiny. For the reasons that follow, we conclude that heightened scrutiny applies to Grimm's claim because the bathroom policy rests on sex-based classifications *and* because transgender people constitute at least a quasi-suspect class. Therefore, to withstand judicial scrutiny, the Board's bathroom policy must be "substantially related to a sufficiently important governmental interest." *See Cleburne*, 473 U.S. at 441. Because we hold that the Board's policy as applied to Grimm is not substantially related to the important objective of protecting student privacy, we affirm summary judgment to Grimm.

### 1.

In determining what level of scrutiny applies to a plaintiff's equal protection claim, we look to the basis of the distinction between the classes of persons. *See generally United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938). Representing two ends of the scrutiny spectrum, most classifications are generally benign and are upheld so long as they are "rationally related to a legitimate state interest," *Cleburne*, 473 U.S. at 440,

whereas race-based classifications are "inherently suspect" and must be "strictly scrutinized," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 223–24 (1995) (internal quotation mark omitted).

Sex is somewhere in the middle, constituting a quasi-suspect class. Sex[8] is only *quasi*-suspect because, although it "frequently bears no relation to the ability to perform or contribute to society,'" *Cleburne*, 473 U.S. at 440–41 (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion)), the Supreme Court has recognized "inherent differences" between the biological sexes that might provide appropriate justification for distinctions, *see Virginia*, 518 U.S. at 534 (citing, as examples of appropriate sex-based distinctions, "compensat[ing] women for particular economic disabilities" and "promot[ing] equal employment opportunity" (internal quotation marks omitted)); *see also Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001) (holding that less burdensome citizenship application requirements for the child of a citizen mother than that of a citizen father withstands intermediate scrutiny, in part because "[t]o fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not be—risks making the guarantee of equal protection superficial, and so disserving it").

---

[8] We acknowledge that the Supreme Court has, in certain equal protection cases, used both the terms "gender" and "sex" interchangeably. *See, e.g., Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982); *Virginia*, 518 U.S. at 515. Therefore, Grimm has preserved an argument that transgender individuals necessarily fall under this line of cases based on gender discrimination. Because we need not reach this question in order to resolve Grimm's appeal, we treat this line of cases on perhaps its narrower terms—that is, as referring to classifications based on biological sex.

Because sex-based classifications are quasi-suspect, they are subject to a form of heightened scrutiny. *Cleburne*, 473 U.S. at 440–41. Specifically, they are subject to intermediate scrutiny, meaning that they "fail[] unless [they are] substantially related to a sufficiently important governmental interest." *See id.* at 441. To survive intermediate scrutiny, the state must provide an "exceedingly persuasive justification" for its classification. *See Virginia*, 518 U.S. at 534.

a.

On its face, the Board's policy creates sex-based classifications for restrooms. It states that the school district will "provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders." J.A. 775. The only logical reading is that "corresponding biological genders" refers back to "male and female." And, although the Board did not define "biological gender," it has defended its policy by taking the position that it will rely on the sex marker on the student's birth certificate. We agree with the Seventh and now Eleventh Circuits that when a "School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate," the policy necessarily rests on a sex classification. *See Whitaker*, 858 F.3d at 1051 (applying heightened scrutiny to a transgender student's equal protection claim regarding a bathroom policy); *see also Adams ex. rel. Kasper v. Sch. Bd. of St. Johns Cty.*, No. 18-13592, 2020 WL 4561817, at *5 (11th Cir. Aug. 7, 2020) (same). As in *Whitaker*, such a policy "cannot be stated without

referencing sex." *See id*.; *accord M.A.B.*, 286 F. Supp. 3d at 719.  On that ground alone, heightened scrutiny should apply.

Moreover, and as the district court held, "Grimm was subjected to sex discrimination because he was viewed as failing to conform to the sex stereotype propagated by the Policy." *Grimm*, 302 F. Supp. 3d at 750.  Many courts, including the Seventh and Eleventh Circuits, have held that various forms of discrimination against transgender people constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes.  *See, e.g.*, *Whitaker*, 858 F.3d at 1051 (holding that the School District's bathroom policy "treat[ed] transgender students . . . who fail to conform to the sex-based stereotypes associated with their assigned sex at birth, differently"); *Glenn v. Brumby*, 663 F.3d 1312, 1319 (11th Cir. 2011) ("Ever since the Supreme Court began to apply heightened scrutiny to sex-based classifications, its consistent purpose has been to eliminate discrimination on the basis of gender stereotypes."); *Smith v. City of Salem*, 378 F.3d 566, 573–75; 578 (6th Cir. 2004) (applying a sex-stereotyping theory, albeit without mentioning a level of scrutiny, and holding that the transgender plaintiff stated a sex discrimination claim in violation of equal protection); *M.A.B.*, 286 F. Supp. 3d at 719 (holding that a school locker room policy was subject to heightened scrutiny because it "classifie[d] [the plaintiff] differently on the basis of his transgender status, and, as a result, subject[ed] him to sex stereotyping"); *see also Doe 1 v. Trump*, 275 F. Supp. 3d 167, 210 (D.D.C. 2017) (military bans on transgender persons subject to heightened scrutiny because they "punish individuals for failing to adhere to

gender stereotypes"), *vacated sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019); *Stone v. Trump*, 280 F. Supp. 3d 747, 768 (D. Md. 2017) (adopting *Doe 1* rationale); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) (holding that discrimination on the basis of transgender status is subject to intermediate scrutiny in part under sex-stereotyping theory).[9]  In so holding, these courts have recognized a central tenet of equal protection in sex discrimination cases: that states "must not rely on overbroad generalizations" regarding the sexes.  *See Virginia*, 518 U.S. at 533; *see also Miss. Univ. for Women*, 458 U.S. at 724–25 ("Although the test for determining the validity of a gender-based classification is straightforward, it must be applied free of fixed notions concerning the roles and abilities of males and females.").

For each of these independent reasons, we hold that the Board's policy constitutes sex-based discrimination as to Grimm and is subject to intermediate scrutiny.  And although the Board raises two related counterarguments in an effort to convince us otherwise, we reject them both.

First, the Board contends that all students are treated the same, regardless of sex, because the policy applies to everyone equally.  *See* Reply Br. 16 (noting that any student may use a "private, single-stall restroom," and "[n]o student is permitted to use the

---

[9] As relied on by the Board, one 2015 district court case goes the other way, *Johnston*, 97 F. Supp. 3d at 671, but the same district court later chose not to follow that decision, *see Evancho v. Pine–Richland Sch. Dist.*, 237 F. Supp. 3d 267, 287 (W.D. Pa. 2017) ("Johnston also acutely recognized that cases involving transgender status implicate a fast-changing and rapidly-evolving set of issues that must be considered in their own factual contexts.  To be sure, Johnston's prognostication of that reality was profoundly accurate." (citation omitted)).

restroom of the opposite sex"). But that is like saying that racially segregated bathrooms treated everyone equally, because everyone was prohibited from using the bathroom of a different race. No one would suppose that also providing a "race neutral" bathroom option would have solved the deeply stigmatizing and discriminatory nature of racial segregation; so too here. Rather, the Board said what it meant: "students with gender identity issues shall be provided an alternative appropriate private facility." J.A. 775. The single-stall restrooms were created *for* "students with gender identity issues." And by "students," the Board apparently meant Grimm, as, per its own deposition witness, it "only ha[d] a sample size of one." J.A. 458. The Board suggests that this purpose insulates its policy from intermediate scrutiny, because it shows that the policy "relies solely on transgender status." *See* Opening Br. 46. But again, how does the Board determine transgender status, if not by looking to what it calls "biological gender"?

Second, the Board contends that even if the policy necessarily involves sex-based discrimination, it cannot violate equal protection because Grimm is not similarly situated to cisgender boys. Instead, it asks us to compare Grimm's treatment under the policy to the treatment of students it would consider to be "biological" girls, because Grimm's "choice of gender identity did not cause biological changes in his body, and Grimm remain[ed] biologically female." Opening Br. 46. But embedded in the Board's framing is its own bias: it believes that Grimm's gender identity is a choice, and it privileges sex-assigned-at-birth over Grimm's medically confirmed, persistent and consistent gender identity. The policy itself "recognizes that some students question their gender identities," and states that such students have "gender identity issues." J.A. 775. Grimm, however,

did not question his gender identity at all; he knew he was a boy. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cty.*, 318 F. Supp. 3d 1293, 1317 (M.D. Fla. 2018) ("There is no evidence to suggest that [the transgender plaintiff's] identity as a boy is any less consistent, persistent and insistent than any other boy."). The overwhelming thrust of everything in the record—from Grimm's declaration, to his treatment letter, to the amicus briefs—is that Grimm was similarly situated to other boys, but was excluded from using the boys restroom facilities based on his sex-assigned-at-birth. Adopting the Board's framing of Grimm's equal protection claim here would only vindicate the Board's own misconceptions, which themselves reflect "stereotypic notions." *See Miss. Univ. for Women*, 458 U.S. at 725 ("Care must be taken in ascertaining whether the [state's] objective itself reflects archaic and stereotypic notions.").[10]

b.

Alternatively, and as held by the district court in this case, we conclude that heightened scrutiny applies because transgender people constitute at least a quasi-suspect class.

Although the Seventh Circuit declined to reach the question of whether heightened scrutiny applies to transgender persons in *Whitaker*, many district courts, including the

---

[10] Our dissenting colleague's opinion reveals why this is so. To avoid a conclusion that Grimm was similarly situated to other boys, the dissent fails to "meaningfully reckon with what it means for [Grimm] to be a transgender boy." *See Adams*, 2020 WL 4561817, at *2 n.2; *see also* Dissenting Op. at 93–94. We have been presented with a strong record documenting the modern medical understanding of what it means to be transgender, and considering that evidence is definitively the role of this Court.

district court here, have analyzed the relevant factors for determining suspect class status and held that transgender people are at least a quasi-suspect class. *See Evancho v. Pine–Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (holding that transgender people constitute a quasi-suspect class); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) (same); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 873 (S.D. Ohio 2016) (same); *M.A.B.*, 286 F. Supp. 3d at 718–19 (same); *Norsworthy*, 87 F. Supp. 3d at 1119 (same); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018) (same); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951–53 (W.D. Wis. 2018) (explaining in a ruling on a preliminary injunction why heightened scrutiny would likely apply to transgender persons).[11]   As articulated by one district court, "one would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people." *Flack*, 328 F. Supp. 3d at 953.  Moreover, the Ninth Circuit recently joined the many district courts in holding that transgender people constitute a quasi-suspect class.  *See Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019) (affirming the district court's reasoning as to why transgender people are a quasi-suspect class).  Only one court of appeals decision holding otherwise remains good law, but it reluctantly followed a since-overruled Ninth Circuit opinion.  *See Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995) (noting that "[r]ecent research concluding

---

[11]   The Eleventh Circuit was not presented with this question in *Adams* because the parties agreed that heightened scrutiny applied to the plaintiff's claim based on that Circuit's precedent in *Glenn*, 663 F.3d at 1319. *See Adams*, 2020 WL 4561817, at *4.

that sexual identity may be biological suggests reevaluation of [*Holloway v. Arthur Andersen & Co.* 566 F.2d 659 (9th Cir. 1977),]" but following it regardless because the plaintiff's allegations were "too conclusory to allow proper analysis").

Engaging with the suspect class test, it is apparent that transgender persons constitute a quasi-suspect class. We consider four factors to determine whether a group of people constitutes a suspect or quasi-suspect class. First, we consider whether the class has historically been subject to discrimination. *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). Second, we determine if the class has a defining characteristic that bears a relation to its ability to perform or contribute to society. *Cleburne*, 473 U.S. at 440–41. Third, we look to whether the class may be defined as a discrete group by obvious, immutable, or distinguishing characteristics. *Bowen*, 483 U.S. at 602. And fourth, we consider whether the class is a minority lacking political power. *Id*. Each factor is readily satisfied here.

First, take historical discrimination. Discrimination against transgender people takes many forms. Like the district court, we provide but a few examples to illustrate the broader picture. *See Grimm*, 302 F. Supp. 3d at 749 ("[T]here is no doubt that transgender individuals historically have been subjected to discrimination on the basis of their gender identity, including high rates of violence and discrimination in education, employment, housing, and healthcare access." (collecting cases)). As explained in the Brief of the Medical Amici, being transgender was pathologized for many years. As recently as the DSM-3 and DSM-4, one could receive a diagnosis of "transsexualism" or "gender identity disorder," "indicat[ing] that the clinical problem was the discordant gender identity." *See* John W. Barnhill, *Introduction*, *in DSM-5 Clinical Cases* 237–38 (John W. Barnhill ed.,

2014). Whereas "homosexuality" was removed from the DSM in 1973, "gender identity disorder" was not removed until the DSM-5 was published in 2013. *See* Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C. L. Rev. 507, 509–10, 517 (2016). What is more, even though being transgender was marked as a mental illness, coverage for transgender persons was excluded from the Americans with Disabilities Act of 1990 (ADA) after a floor debate in which two senators referred to these diagnoses as "sexual behavior disorders." *See* Barry et al., *supra*, at 510; *see also* 42 U.S.C. § 12211(b)(1). The following year, Congress added an identical exclusion to the Rehabilitation Act of 1973, "stripping transgender people of civil rights protections they had enjoyed for nearly twenty years." Barry et al., *supra*, at 556; *see also* H.R. Rep. No. 102-973, at 158 (1992).

The transgender community also suffers from high rates of employment discrimination, economic instability, and homelessness. According to the National Transgender Discrimination Survey (NTDS),[12] people who are transgender are twice as likely as the general population to have experienced unemployment. When employed, 97% of NTDS respondents reported experiencing some form of mistreatment at work, or "hiding their gender transition to avoid such treatment." Barry et al., *supra*, at 552. NTDS respondents were "four times more likely than the general population to have a household

---

[12] The NTDS is a major national survey on transgender discrimination. Along with its successor, the USTS, the NTDS has been relied upon by many amici to this case, as well as other courts. *See, e.g., Whitaker*, 858 F.3d at 1051 (citing to the NTDS); *M.A.B.*, 286 F. Supp. 3d at 720 (citing to both the NTDS and the USTS); *Adkins*, 143 F. Supp. 3d at 139 (relying on the NTDS).

income of less than $10,000 per year," and two and a half times more likely to have experienced homelessness. *Id.*

That is not all. Transgender people frequently experience harassment in places such as schools (78%), medical settings (28%), and retail stores (37%), and they also experience physical assault in places such as schools (35%) and places of public accommodation (8%). *See id.* at 553. Indeed, transgender people are more likely to be the victim of violent crimes. *Id.* So, in 2009, Congress expanded federal protections against hate crimes to include crimes based on gender identity. *Id.* at 555. In so doing, the House Judiciary Committee recognized the "extreme bias against gender nonconformity" and the "particularly violent" crimes perpetrated against transgender persons. *See id.*

Of course, current measures and policies continue to target transgender persons for differential treatment. Without opining on the *legality* of such measures, we note that policies precluding transgender persons from military service, even after the repeal of "Don't Ask, Don't Tell," *see* Gary J. Gates & Jody L. Herman, *Transgender Military Service in the United States* 1 (2014), have recently been re-implemented as to most transgender service members. And this year, the Governor of Idaho signed into law a bill that would ban transgender individuals from changing the gender marker on their birth certificates, as Virginia law allowed Grimm to do. Further still, the Department of Health and Human Services recently issued a final rule redefining "sex discrimination" for purposes of Section 1557 of the Affordable Care Act to encompass only biological sex, and not gender identity. The list surely goes on.

Next, we turn to the second factor—whether the class has a defining characteristic that "bears [a] relation to ability to perform or contribute to society.'" *Cleburne*, 473 U.S. at 440–41 (quoting *Frontiero*, 441 U.S. at 677). Being transgender bears no such relation. Seventeen of our foremost medical, mental health, and public health organizations agree that being transgender "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *See* Br. of Medical Amici 6 (quoting Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender and Gender Variant Individuals* 1 (2012)). Although some transgender individuals experience gender dysphoria, and that could cause some level of impairment, not all transgender persons have gender dysphoria, and gender dysphoria is treatable. *See id.* "Importantly, 'transgender' and 'impairment' are not synonymous." Barry et al., *supra*, at 558.

That leaves the third and fourth factors. As to the third factor, transgender people constitute a discrete group with immutable characteristics: Recall that gender identity is formulated for most people at a very early age, and, as our medical amici explain, being transgender is not a choice. Rather, it is as natural and immutable as being cisgender. Br. of Medical Amici 7. But unlike being cisgender, being transgender marks the group for different treatment.

Fourth and finally, transgender people constitute a minority lacking political power. Comprising approximately 0.6% of the adult population in the United States, transgender individuals are certainly a minority. Even considering the low percentage of the population that is transgender, transgender persons are underrepresented in every branch of government. It was not until 2010 that the first openly transgender judges took their place

on their states' benches, *see First Two Openly Transgender Judges in the U.S. Appointed Last Month*, Women's Law Project (Dec. 7, 2010), https://www.womenslawproject.org/2010/12/07/first-two-openly-transgender-judges-in-the-u-s-appointed-last-month/, and we know of no openly transgender federal judges. There is a similar dearth of openly transgender persons serving in the executive and legislative branches. In 2017, nine openly transgender individuals were elected to office—more than doubling the total number of transgender individuals in *any* elected office across the country. *See* Brooke Sopelsa, *Meet 2017's Newly Elected Transgender Officials*, NBC News (Dec. 28, 2017, 9:06 AM EST), https://www.nbcnews.com/feature/nbc-out/meet-2017-s-newly-elected-transgender-officials-n832826; *see also* Logan S. Casey, *Transgender Candidates*, https://www.loganscasey.com/trans-candidates-project. And the examples of discrimination cited under the first factor affirm what we intuitively know: Transgender people constitute a minority that has not yet been able to meaningfully vindicate their rights through the political process.

The Board does not, and truly cannot, contend that transgender people do not constitute a quasi-suspect class under these four factors. Instead, it counsels judicial modesty, suggesting that we are admonished not to name new suspect classes. *See Cleburne*, 473 U.S. at 441–42 ("[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued."); *see also Johnston*, 97 F. Supp.

45

3d at 668–69.  But no hard-and-fast rule prevents this Court from concluding that a quasi-suspect class exits, nor have *Cleburne*'s dicta prevented many other courts from so concluding.

For the foregoing reasons, we hold that the Board's restroom policy constitutes sex-based discrimination and, independently, that transgender persons constitute a quasi-suspect class.

2.

Whether because the policy constitutes sex-based discrimination or because transgender persons are a quasi-suspect class, we apply heightened scrutiny to hold that the Board's policy is not substantially related to its important interest in protecting students' privacy.[13]

No one questions that students have a privacy interest in their body when they go to the bathroom.  But the Board ignores the reality of how a transgender child uses the bathroom: "by entering a stall and closing the door."  *Whitaker*, 858 F.3d at 1052; *see also Adams*, 318 F. Supp. 3d at 1296, 1314 ("When he goes into a restroom, [the transgender student] enters a stall, closes the door, relieves himself, comes out of the stall, washes his hands, and leaves.").  Grimm used the boys restrooms for *seven weeks* without incident.  When the community became aware that he was doing so, privacy in the boys restrooms actually increased, because the Board installed privacy strips and screens between the urinals.  Given these additional precautions, the Board's Rule 30(b)(6) deposition witness

---

[13] Grimm argues on appeal that he wins even under rational basis review.  In light of our holding above, we need not analyze his claim under that level of review.

could not identify any other privacy concern. The Board does not present any evidence that a transgender student, let alone Grimm, is likely to be a peeping tom, rather than minding their own business like any other student. Put another way, the record demonstrates that bodily privacy of cisgender boys using the boys restrooms did not increase when Grimm was banned from those restrooms. Therefore, the Board's policy was not substantially related to its purported goal.

The insubstantiality of the Board's fears has been borne out in school districts across the country, including other school districts in Virginia. Nearly half of Virginia's public-school students attend schools prohibiting discrimination or harassment based on gender identity. *See* Br. of Virginia School Board Amici 4. Although community members espoused similar fears at school board meetings before the anti-discrimination measures, none of those fears have materialized. *Id*. at 17–19. Those Virginia school boards have had no difficulty implementing trans-inclusive bathroom policies and explain that they "have seen none of the negative consequences predicted by opponents of such policies." *Id*. at 5.

The same can be said across the country. *See* Br. of School Administrator Amici 18–24 (explaining that in amici's states, the concerns raised by the Board have not materialized). One school administrator in Kentucky, who was previously against allowing transgender students to use the bathroom corresponding to their gender, explained that his experience with shifting the policy demonstrated that all the concerns were "philosophical." *Id.* at 17. In these administrators' experiences, "showing respect for each student's gender identity supports the dignity and worth of all students by affording them

47

equal opportunities to participate and learn." *Id*. at 32.  And the National PTA, GLSEN, American School Counselor Association, and National Association of School Psychologists similarly assure us that the experiences of schools and school districts across the country "put the lie to supposed legitimate justifications for restroom discrimination: preventing students who pretend to be transgender from obtaining access to opposite-gender restrooms and protecting privacy."  Br. of Education Association Amici 6.

We thus agree with the district court's apt conclusion that "the Board's privacy argument 'is based upon sheer conjecture and abstraction.'"  *Grimm*, 400 F. Supp. 3d at 461 (quoting *Whitaker*, 858 F.3d at 1052).  The Board cites to no incident, either in Gloucester County or elsewhere.  It ignores the growing number of school districts across the country who are successfully allowing transgender students such as Grimm to use the bathroom matching their gender identity, without incident.  And it ignores its own seven-week experience with doing the same in Gloucester County High School.  Notably, both the Third and Ninth Circuits have now rejected privacy-related challenges brought by cisgender students to the shared use of restrooms with transgender students of the opposite biological sex.  *See Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3rd Cir. 2018).  And before this opinion was filed, the Eleventh Circuit, applying heightened scrutiny to a transgender student's equal protection challenge to his high school's bathroom policy, similarly held that application of the policy did not withstand such scrutiny due, in part, to the hypothetical nature of the asserted privacy concerns.  *See Adams*, 2020 WL 4561817, at *4–5, 7.

Moreover, we conclude that the Board's policy is "marked by misconception and prejudice" against Grimm. *See Tuan Anh Nguyen*, 533 U.S. at 73. The Board's proposed policy was concocted amidst a flurry of emails from apparently concerned community members and adopted in the context of two heated Board meetings filled with vitriolic, off-the-cuff comments, such as referring to Grimm as a "freak." Parents threatened to vote out the Board members if they allowed Grimm to continue to use the boys restrooms. One would be hard-pressed to look at the record and think that the Board sought to understand Grimm's transgender status or his medical need to socially transition, as identified by his treating physician. Rather, in a moment when he was finally able to affirm his gender, the Board treated Grimm as "questioning" his identity and lumped his in with what it considered to be "gender identity issues."

By relying on so-called "biological gender," the Board successfully excluded Grimm from the boys restrooms. But it did not create a policy that it could apply to other students, such as students who had fully transitioned but had not yet changed their sex on their birth certificate. As demonstrated by the record and amici such as interACT, the Board's policy is not readily applicable to other students who, for whatever reason, do not have genitalia that match the binary sex listed on their birth certificate—let alone that matches their gender identity. *See* Br. for Amicus Curiae interACT: Advocates for Intersex Youth in Supp. of Pl.-Appellee 20–23. Instead, the Board reacted to what it considered a problem, Grimm's presence, by isolating him from his peers.

49

B.  The Board's Failure to Amend Grimm's School Records

 Having held that the Board's bathroom policy violated Grimm's equal protection rights, we easily conclude that the Board's continued refusal to update his school records similarly violates those rights.[14]  Unlike students whose gender matches their sex-assigned-at-birth, Grimm is unable to obtain a transcript indicating that he is male.  The Board's decision is not substantially related to its important interest in maintaining accurate records because Grimm's legal gender in the state of Virginia is male, not female.

The Board's only rebuttal is that Grimm did not provide a lawfully obtained amended birth certificate.  Recall that Grimm received a state-court order changing his gender to "male," and he then presented the school with his amended birth certificate.  The Board complains that the copy said "VOID," that it did not say the word "amended," and that the Gloucester County Circuit Court granted Grimm's motion to change his sex to male based on chest reconstruction surgery.  As found by the district court, however: "It is obvious from the face of the amended birth certificate that the photocopy presented to the Board was marked 'void' because it was a copy of a document printed on security paper, not because it was fabricated."  *Grimm*, 400 F. Supp. 3d at 458 n.6.  Moreover, while the Board may disagree with the Gloucester County Circuit Court's order granting Grimm's motion to change his sex to male because it believes that chest reconstruction does not

---

[14] The dissent does not address Grimm's school records, presumably because it would hold that Grimm is not similarly situated to other boys—full stop.  Yet Virginia recognized Grimm as male and *amended his birth certificate*.  Although preserving sex-assigned-at-birth separated restrooms may rouse more sentiment, the less-contentious school records issue sheds light on why application of such a restroom policy to transgender students is problematic.

classify as gender reassignment surgery under Virginia law, we must give full faith and credit to that state court's order, which cannot be collaterally attacked in this appeal. *See* 28 U.S.C. § 1738. And in the face of the declaration of State Registrar and Director of the Division of Vital Records assuring that she issued Grimm a valid amended birth certificate, we grow weary of the Board's repeated arguments that it received anything less than an official document.

*     *     *

For the foregoing reasons, we affirm the district court's grant of summary judgment to Grimm on his equal protection claim.

### V. Grimm's Title IX Claim

We next address Grimm's claim that the Board's restroom policy and refusal to amend his school records also violated Title IX. Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To grant summary judgment to Grimm on his Title IX claim, we must find (1) that he was excluded from participation in an education program "on the basis of sex"; (2) that the educational institution was receiving federal financial assistance at the time; and (3) that improper discrimination caused him harm. *See Preston v. Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994). There is no question that the Board received federal funding or that restrooms are part of the

education program.  At issue in this case is whether the Board acted "on the basis of sex,"

and if so, whether that was unlawful discrimination that harmed Grimm.

## A.  The Board's Restroom Policy

We first address the restroom policy.  After the Supreme Court's recent decision in

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), we have little difficulty holding that a

bathroom policy precluding Grimm from using the boys restrooms discriminated against

him "on the basis of sex."  Although *Bostock* interprets Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e–2(a)(1), it guides our evaluation of claims under Title IX.  *See*

*Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007); *cf. Fitzgerald v. Barnstable*

*Sch. Comm.*, 555 U.S. 246, 258 (2009) ("Congress modeled Title IX after Title VI . . . and

passed Title IX with the explicit understanding that it would be interpreted as Title VI

was." (citation omitted)).  In *Bostock*, the Supreme Court held that discrimination against

a person for being transgender is discrimination "on the basis of sex."  As the Supreme

Court noted, "it is impossible to discriminate against a person for being homosexual or

transgender without discriminating against that individual based on sex."  *Bostock*, 140 S.

Ct. at 1741.  That is because the discriminator is necessarily referring to the individual's

sex to determine incongruence between sex and gender, making sex a but-for cause for the

discriminator's actions.  *See id*. at 1741–42.  As explained above in the equal protection

discussion, the Board could not exclude Grimm from the boys bathrooms without

referencing his "biological gender" under the policy, which it has defined as the sex marker

on his birth certificate.  Even if the Board's primary motivation in implementing or

applying the policy was to exclude Grimm because he is transgender, his sex remains a but-for cause for the Board's actions.  Therefore, the Board's policy excluded Grimm from the boys restrooms "on the basis of sex."[15]

We similarly have no difficulty holding that Grimm was harmed.  As the district court found:

> In his Declaration, Mr. Grimm described under oath feeling stigmatized and isolated by having to use separate restroom facilities.  His walk to the restroom felt like a "walk of shame."  He avoided using the restroom as much as possible and developed painful urinary tract infections that distracted him from his class work.  This stress "was unbearable" and the resulting suicidal thoughts he suffered led to his hospitalization at Virginia Commonwealth University Medical Center Critical Care Hospital.

*Grimm*, 400 F. Supp. 3d at 458 (citations omitted).  Grimm also "broke down sobbing" when a restroom was unavailable after school, and he could not attend football games without worrying about where he would use the restroom.  *See id.* at 459.

---

[15] We pause to note another theory under which Grimm may have been discriminated "on the basis of sex."  In *Price Waterhouse v. Hopkins*, the Supreme Court held that sex stereotyping constitutes discrimination on the basis of gender for purposes of Title VII.  *See* 490 U.S. 228, 250 (1989) ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.").  Various circuits have applied *Price Waterhouse* to Title VII gender stereotyping claims in the LGBTQ+ context, although we have not.  Most notably, in *Hively v. Ivy Tech Community College*, the Seventh Circuit applied the logic of *Price Waterhouse* and held in an en banc opinion that a lesbian woman who was fired could state a Title VII gender-stereotyping claim.  *See* 853 F.3d 339, 351–52 (7th Cir. 2017) (en banc).  The district court similarly relied on *Price Waterhouse* below.  *Grimm*, 302 F. Supp. at 750.  For the reasons discussed above in the equal protection section of our opinion, we agree that the policy punished Grimm for not conforming to his sex-assigned-at-birth.  But having had the benefit of *Bostock*'s guidance, we need not address whether Grimm's treatment was also "on the basis of sex" for purposes of Title IX under a *Price Waterhouse* sex-stereotyping theory.

The Board does not provide evidence contradicting Grimm's or his mother's declarations. Rather, it has quibbled with the amount of harm Grimm felt, asserting below, for example, that he needed a medical expert to prove urinary tract infections. But in a nominal damages case, Grimm's harm need not be precisely calculated. For summary judgment purposes, it matters only that there is no genuine issue of material fact as to whether the bathroom policy harmed Grimm. There is no question that Grimm suffered legally cognizable harm for at least two reasons.

First, on a practical level, the physical locations of the alternative restrooms were inconvenient and caused Grimm harm. The nurse's room was far from his classes, as were the three single-user restrooms. The distance caused him to be late for class or away from class for longer than students and teachers perceived as normal. And when he attended after-school events, he had to be driven away just to use the restroom.

Second, in a country with a history of racial segregation, we know that "[s]egregation not only makes for physical inconveniences, but it does something spiritually to an individual." Martin Luther King, Jr., "Some Things We Must Do," Address Delivered at the Second Annual Institute on Nonviolence and Social Change at Holt Street Baptist Church (Dec. 5, 1957); *see also* Br. of Amicus Curiae NAACP Legal Def. & Educ. Fund, Inc. in Supp. of Pl.-Appellee 7 (outlining the harms and erroneous rationales of racial segregation). The stigma of being forced to use a separate restroom is likewise sufficient to constitute harm under Title IX, as it "invite[s] more scrutiny and attention" from other students, "very publicly brand[ing] all transgender students with a scarlet 'T'." *Boyertown*, 897 F.3d at 530 (quoting *Whitaker*, 858 F.3d at 1045); *see also*

*id.* (rejecting the suggestion that transgender students be offered single-stall restrooms, rather than be allowed to use the regular restrooms matching their gender identity). Even Grimm's high school principal "understood [Grimm's] perception" that the policy sent the following message: Gavin was not welcome. J.A. 405–06. Although the principal assumed some students may have used that restroom, Grimm never saw anyone else use the restrooms created for students with "gender identity issues." The resulting emotional and dignitary harm to Grimm is legally cognizable under Title IX. *See Adams*, 2020 WL 4561817, at *13, 16 (holding that a transgender student's "psychological and dignitary harm" caused by a school bathroom policy was legally cognizable under Title IX).

Having determined that Grimm was harmed, we finally turn to the heart of the Title IX question in this case: whether the policy unlawfully discriminated against Grimm. *Bostock* expressly does not answer this "sex-separated restroom" question. 140 S. Ct. at 1753. In the Title IX context, discrimination "mean[s] treating that individual worse than others who are similarly situated." *Id.* at 1740 (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 59 (2006)). In light of our equal protection discussion above, this should sound familiar: Grimm was treated worse than students with whom he was similarly situated because he alone could not use the restroom corresponding with his gender. Unlike the other boys, he had to use either the girls restroom or a single-stall option. In that sense, he was treated worse than similarly situated students.

Nevertheless, the Board emphasizes a Department of Education implementing regulation, 34 C.F.R. § 106.33, which interprets Title IX to allow for "separate toilet, locker room, and shower facilities on the basis of sex," so long as they are "comparable" to each

other.  But Grimm does not challenge sex-separated restrooms; he challenges the Board's discriminatory exclusion of himself from the sex-separated restroom matching his gender identity.  *See also Adams*, 2020 WL 4561817, at *14 (holding that § 106.33 did not preclude a transgender student's Title IX claim, because he was not challenging sex-separated restrooms, but "simply seeking access to the boys' restroom as a transgender boy.").  And the implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex.  All it suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to students like Grimm, the Board may rely on its own discriminatory notions of what "sex" means.[16]  *See Adams*, 2020 WL 4561817, at *15 (holding that "nothing in *Bostock* or the language of § 106.33 justifie[d] the School Board's discrimination" against a male transgender student seeking access to the boys restrooms).[17]

---

[16] So too for the more generic Title IX provision allowing for sex-separated living facilities.  *See* 20 U.S.C. § 1686 (Title IX shall not "be construed to prohibit any educational institution" to which it applies "from maintaining separate living facilities for the different sexes.").  Again, this is a broad statement that sex-separated living facilities are not unlawful—not that schools may act in an arbitrary or discriminatory manner when dividing students into those sex-separated facilities.  In any event, because 34 C.F.R. § 106.33 is more specific to bathrooms, it is where the parties have focused their attention.

[17] The dissent suggests that Grimm should have challenged Title IX as unconstitutional, because Grimm's use of the boys restrooms would somehow upend sex-separated restrooms in schools.  *See* Dissenting Op. at 90.  But Grimm does not think that sex-separated restrooms are unconstitutional, and neither do we.  The dissent's feared loss of sex-separated restrooms has not been borne out in any of the many school districts that allow transgender students to use the sex-separated restroom matching their gender identity.  So it cannot be the physical loss of sex-separated restrooms that the dissent laments, but some emotional, intangible loss wrought by the mere presence of transgender persons.  This type of argument calls to mind recent arguments against gay marriage, to (Continued)

As explained above, Grimm consistently and persistently identified as male.  He had been clinically diagnosed with gender dysphoria, and his treatment provider identified using the boys restrooms as part of the appropriate treatment.  Rather than contend with Grimm's serious medical need, the Board relied on its own invented classification, "biological gender," for which it turned to the sex on his birth certificate.  And even when Grimm provided the school with his amended birth certificate, the Board *still* denied him access to the boys restrooms.

For these reasons, we hold that the Board's application of its restroom policy against Grimm violated Title IX.[18]

---

the effect that allowing gay people to marry would "harm marriage as an institution."  *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2606 (2015).  With no "foundation for the conclusion" that such "harmful outcomes" would occur, *see id.*, we similarly reject this institutional-harm type argument.

[18] Noting that Title IX was passed under the Spending Clause, the Board also asserts that, if ambiguous, we must construe Title IX to allow application of its bathroom policy to Grimm in order to give the Board fair notice.  *See generally Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  But *Bostock* forecloses that "on the basis of sex" is ambiguous as to discrimination against transgender persons, and notes that Title VII "has repeatedly produced unexpected applications, at least in the view of those on the receiving end of them."  *See Bostock*, 140 S. Ct. at 1753 ("Congress's key drafting choices—to focus on discrimination against individuals and not merely between groups and to hold employers liable whenever sex is a but-for cause of the plaintiff's injuries— virtually guaranteed that unexpected applications would emerge over time.").  So too Title IX.  And the Board knew or should have known that the separate facilities regulation did not override the broader statutory protection against discrimination.  We reject the Board's *Pennhurst* argument.

B.  The Board's Failure to Amend Grimm's School Records

Applying the same framework to the Board's refusal to update Grimm's school records, we hold that it too violated Title IX.  Again, the Board based its decision not to update Grimm's school records on his sex—specifically, his sex as listed on his original birth certificate, and as it presupposed him to be.  This decision harmed Grimm because when he applies to four-year universities, he will be asked for a transcript with a sex marker that is incorrect and does not match his other documentation.  And this discrimination is unlawful because it treats him worse than other similarly situated students, whose records reflect their correct sex.

Accordingly, we affirm the district court's grant of summary judgment on Grimm's Title IX claim, and the relief granted, in full.

## VI.  Conclusion

Grimm's four years of high school were shaped by his fight to use the restroom that matched his consistent and persistent gender identity.  In the face of adults who misgendered him and called him names, he spoke with conviction at two Board meetings. The solution was apparent: allow Grimm to use the boys restrooms, as he had been doing without incident.  But instead, the Board implemented a policy that treated Grimm as "questioning" his identity and having "issues," and it sent him to special bathrooms that might as well have said "Gavin" on the sign.  It did so while increasing privacy in the boys bathrooms, after which its own deposition witness could not cite a remaining privacy concern.  We are left without doubt that the Board acted to protect cisgender boys from

58

Gavin's mere presence—a special kind of discrimination against a child that he will no doubt carry with him for life.

The Board did so despite advances in the medical community's understanding of the nature of being transgender and the importance of gender affirmation. It did so after a major nationwide survey, the NTDS, put stark numbers to the harmful discrimination faced by transgender people in many aspects of their lives, including in school.

It also did so while schools across Virginia and across the country were successfully implementing trans-inclusive bathroom policies, again, without incident. Those schools' experiences, as outlined in three amicus briefs, demonstrate that hypothetical fears such as the "predator myth" were merely that—hypothetical. Perhaps unsurprisingly, those schools also discovered that their biggest opponents were not students, but adults. *See* Br. of School Administrator *Amici* 10–11. One administrator noted:

> As to the students, I am most impressed. They are very understanding and accepting of their classmates. It feels like the adult community is struggling with it more.

*Id*. at 10. As another explained, "Young people are pretty savvy and comfortable, and can understand and empathize with someone who just wants to use the bathroom." *Id*.

The proudest moments of the federal judiciary have been when we affirm the burgeoning values of our bright youth, rather than preserve the prejudices of the past. *Compare Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), *and Bowers v. Hardwick*, 478 U.S. 186 (1986), *with Brown v. Bd. of Educ. of Topeka*, 349 U.S. 294 (1955), *and Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). How shallow a promise of equal protection

that would not protect Grimm from the fantastical fears and unfounded prejudices of his adult community.

It is time to move forward.  The district court's judgment is

*AFFIRMED.*

WYNN, Circuit Judge, concurring:

I fully concur in Judge Floyd's opinion and write separately to emphasize several particularly troublesome aspects of the Board's policy. In particular, the Board's classification on the basis of "biological gender"—defined in this appeal as the sex marker on a student's birth certificate—is arbitrary and provides no consistent reason to assign transgender students to bathrooms on a binary male/female basis. Rather, the Board's use of "biological gender" to classify students has the effect of shunting individuals like Grimm—who *may not* use the boys' bathrooms because of their "biological gender," and who *cannot* use the girls' bathrooms because of their gender identity—to a third category of bathroom altogether: the "alternative appropriate private facilit[ies]" established in the policy for "students with gender identity issues."

That is indistinguishable from the sort of separate-but-equal treatment that is anathema under our jurisprudence. No less than the recent historical practice of segregating Black and white restrooms, schools, and other public accommodations, the unequal treatment enabled by the Board's policy produces a vicious and ineradicable stigma. The result is to deeply and indelibly scar the most vulnerable among us—children who simply wish to be treated as equals at one of the most fraught developmental moments in their lives—by labeling them as unfit for equal participation in our society. And for what gain? The Board has persisted in offering hypothetical and pretextual concerns that have failed to manifest, either in this case or in myriad others like it across our nation. I am left to conclude that the policy instead discriminates against transgender students out of a bare dislike or fear of those "others" who are all too often marginalized in our society for the

61

mere fact that they are different. As such, the policy grossly offends the Constitution's basic guarantee of equal protection under the law.

## I.

## A.

First, the Board's policy provides no consistent basis for assigning transgender students—who often possess a mix of male and female physical characteristics—to a particular bathroom. The policy, which was drafted by a Board member without consulting medical professionals, purports to classify students based on their "biological gender." J.A. 775. As the district court noted, this term has no standard meaning (to say nothing of widespread acceptance) in the medical field. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444, 457 (E.D. Va. 2019) (citing Wylie C. Hembree et al., *Endocrine Treatment of Gender-dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102(11), J. CLIN. ENDOCRINOLOGY & METABOLISM 3869, 3875 (2017)). Rather, "biological gender," on its face, conflates two medical concepts: a person's biological sex (a set of physical traits) and gender (a deeply held sense of self). *Id.*

Given that the Board seemingly created the concept of "biological gender" *sua sponte*, it comes as no surprise that it has struggled to define the term in a way that provides any consistent reason to assign a given transgender student to a male or female restroom.

Broadly, the Board claims that "biological gender" is defined solely in terms of physiological characteristics.[1]

That suggests that the Board can identify some set of physical characteristics that fully identify someone as "male" or "female"—and thus neatly partition transgender students into those two categories. Yet the Board has offered no set of physical characteristics determinative of its "biological gender" classification in the five-year pendency of this case.

Nor could it, given that transgender individuals often defy binary categorization on the basis of physical characteristics alone. For instance, although Grimm was born physically female and had female genitals during his time at Gloucester High, he also had physical features commonly associated with the male sex: he lacked breasts (due to his chest reconstruction surgery); had facial hair, a deepened voice, and a more masculine appearance (due to hormone therapy); and presented as male through his haircut. The Board conveniently ignores all these facts, other than to claim that Grimm's chest reconstruction surgery "did not create any biological changes in Grimm, but instead, only a physical change." Opening Br. at 46.

Rather than address this reality, the Board has instead narrowed its definition of "biological gender" to refer to the sex marker on a student's birth certificate—which, unless updated during a transgender individual's transition, merely tells the Board what

---

[1] I note that the Board's use of the term "gender" in "biological gender," along with the policy's reference to students with "gender identity issues," suggests that Grimm's gender identity played a part in the Board's bathroom designation, despite the Board's protestations to the contrary. J.A. 775.

physical sex characteristics a person was born with. But, as this case shows, a person's birth sex is not dispositive of their actual physiology.

Moreover, by focusing on an individual's birth certificate, the Board ensures the policy lacks a basic consistency: it fails to treat *even transgender* students alike. Specifically, the policy targets transgender students whose birth certificates do not match their outward physical characteristics while ignoring those transgender students whose birth certificates are consistent with their outward physiology.

Consider a student physically identical to Grimm in every respect—that is, a student who appeared outwardly male, but who had female genitals. If, unlike Grimm, this hypothetical student had obtained a birth certificate identifying him as male prior to enrolling at Gloucester High, then that student *would* have been able to use the boys' restrooms under the Board's current interpretation of its own policy. It is arbitrary that this hypothetical transgender student would not be subject to the policy, whereas Grimm would. *See Adams By & Through Kasper v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, 2020 WL 4561817, at *5 (11th Cir. Aug. 7, 2020) ("To pass muster under the Fourteenth Amendment, a governmental gender classification must 'be reasonable, not arbitrary.'" (quoting *Reed v. Reed*, 404 U.S. 71, 76 (1971) (quotation marks omitted)).

Such a student would, of course, have female genitals. But genital characteristics are immaterial if, as the Board claims, it is solely concerned with the sex marker on a student's birth certificate. However, the record shows that the Board was *not* only concerned with birth certificates below.

Apparently taking issue with the fact that Grimm's genitals did not match his birth certificate, the Board attempted to extend its sex-assigned-at-birth definition of "biological gender" in its summary judgment briefing at the district court. The Board claimed that if a student were using the restroom associated with the sex listed on their birth certificate, but the school learned that the student had some as-yet-unspecified set of anatomical characteristics of the opposite sex, it would require the student to switch bathrooms on the basis of those physiological differences.

The Board wisely abandoned that argument on appeal, given its inability to specify what set of physiological characteristics suffices to push an individual across its imagined line of demarcation between male and female classifications. But its shifting definitions of "biological gender" suggest that the policy is ends-driven and motivated more by discomfort with the presence of someone who appeared as a boy (but nonetheless had female genitals) using the boys' bathroom than concerns for a person's designation at birth.

## B.

That suggestion is bolstered by another disturbing inconsistency in the policy: it produces the very privacy harms it purportedly seeks to avoid. Despite appearing wholly male except for his genitals, Grimm could have used the girls' restroom under the policy. Female students would thus have found themselves in a private situation in front of someone with the physiology of the opposite biological sex—the exact harm to male students posited by the Board and my dissenting colleague, Judge Niemeyer. *See* Niemeyer Dis. Op. at 88-89, 93.

65

Specifically, the Board claims the policy protects the privacy interests of students who do not wish to be exposed to, or in a state of undress in front of, those with physical characteristics of the opposite sex. That is undoubtedly a long-recognized and important government interest, as Judge Niemeyer points out. Niemeyer Dis. Op. at 88-89. But, as Judge Floyd notes, the Board can identify no instance of such harms to the privacy interests of its students—a result consistent with the experiences of numerous school boards nationwide. Maj. Op. at 46-48.

That is unsurprising because, as a matter of common sense, any individual's appropriate use of a public bathroom does not involve exposure to nudity—an observation that is particularly true given the privacy enhancements installed in the bathrooms at Gloucester High. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017) ("Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall.").

Judge Niemeyer in dissent suggests that the "*mere presence*" of someone with female genitals in a male bathroom would create an untenable intrusion on male privacy interests. Niemeyer Dis. Op. at 89. That assertion is debatable at the least, in the context of both male and female bathrooms. And it echoes the sort of discomfort historically used to justify exclusion of Black, gay, and lesbian individuals from equal participation in our society, as discussed *infra*. But it is ultimately beside the point, because the Board identified only three scenarios of concern in which boys would have felt unduly exposed to Grimm: when they used the stalls, when they used the urinals, and when they opened

their pants to tuck in their shirts. The Board has identified no instances where such exposure occurred.

Crucially, even if were we to accept the Board's contention that the alleged infringements on student bodily privacy were in fact present, then the policy would, on balance, harm student privacy interests more than it helped them. Unlike his clothed genitals, Grimm's male characteristics—no breasts, masculine features and voice timbre, facial hair, and a male haircut—would have been readily apparent to any person using the girls' restroom. Put simply, Grimm's entire outward physical appearance was male. As such, there can be no dispute that had he used the girls' restroom, female students would have suffered a similar, if not greater, intrusion on bodily privacy than that the Board ascribes to its male students. The Board's stated privacy interests thus cannot be said to be an "exceedingly persuasive" justification of the policy. *United States v. Virginia*, 518 U.S. 515, 532 (1996).

Further, if the Board's concern were truly that individuals might be exposed to those with differing physiology, it would presumably have policies in place to address differences between pre-pubescent and post-pubescent students, as well as intersex individuals who possess some mix of male and female physical sex characteristics and who comprise a greater fraction of the population than transgender individuals. *See Whitaker*, 858 F.3d at 1052-53; Br. for Amicus Curiae interACT: Advocates for Intersex Youth in Supp. of Pl.-Appellee 5 (noting that 2% of all children born worldwide have variations in sex organs, chromosomes, and hormones that do not fit within binary anatomical gender classifications); Maj. Op. at 7 (noting that .6% of the United States adult population is

transgender). That the Board's policy does not address those circumstances further suggests that its privacy justification is a post-hoc rationalization based on mere hypotheticals. *Virginia*, 518 U.S. at 533.

C.

One final note. Under the Board's policy, Grimm should have been able to use the boys' restroom if he had provided an updated birth certificate listing him as male. Of course, *he did just that*. But the Board baldly refused to apply its own policy, instead assembling a variety of post-hoc administrative justifications for its noncompliance— justifications that were ultimately meritless. *See* Maj. Op. at 30-31.

II.

The above problems notwithstanding, the Board audaciously invites us to ignore the policy's poorly formulated, arbitrary character, claiming that "[e]very student can use a restroom associated with their physiology, whether they are boys or girls. If students choose not to use the restroom associated with their physiology, they can use a private, single-stall restroom." Opening Br. at 44. But that choice is no choice at all because, its above-described physiological misunderstandings and omissions aside, the Board completely misses the reality of what it means to be a transgender boy.

As Judge Floyd thoroughly notes, historical experience and decades of scientific inquiry have established that transgender individuals have an innate conception of themselves as belonging to one gender. Maj. Op. at 7-14. A transgender person's awareness of themselves as male or female is no less foundational to their essential personhood and sense of self than it is for those born with female genitals to identify as female, or for those

68

born with male genitals to identify as male. History demonstrates that this self-conception is unshakeable indeed. Transgender individuals have persisted despite the significant harms that arose from living in societies that did not recognize them: cultural marginalization and disregard at best, and horrific oppression and lethal violence at worst.

So, despite the Board's contention that there is no problem because Grimm could have used the girls' bathrooms or the single-stall bathrooms, we must take a careful and practical look at the options he realistically faced. Grimm was of course barred from the boys' restrooms because of his Board-defined "biological gender." And despite the Board's assurances, he effectively could not use the girls' restrooms. His gender identity has always been male. *He could no more easily use the girls' restrooms than a cisgender boy.*[2] The Board pointedly ignores this basic fact.

So, Grimm was effectively left with one option: the single-stall restrooms. But he did not use those restrooms at all because doing so "made [him] feel even more stigmatized and isolated than using the nurse's office" to which he had been previously relegated. Gavin Grimm Decl. ¶ 47. Specifically, "everyone knew that they were installed for [him] in particular, so that other boys would not have to share the same restroom as [him]." *Id.* Indeed, the Board does not controvert Grimm's assertion that no other students used the single-stall restrooms.

---

[2] Grimm had, of course, used girls' restrooms before his transition. But that fact says nothing about the harm he suffered from doing so. Grimm suffered from gender dysphoria as a result of living as a girl (including use of girls' bathrooms) despite identifying as a boy.

69

This problem is all too familiar. Forced segregation of restrooms and schools along racial lines—a blight on this country's history—occurred well within living memory. *See* Br. of Amicus Curiae NAACP Legal Def. & Educ. Fund, Inc. in Supp. of Pl.-Appellee 7-8 (hereinafter "Br. of NAACP") (describing various laws passed to segregate restroom facilities and schools on the basis of race). Such segregation was infamously justified on the ground that no harm could inhere if separate but equal facilities were provided to African American schoolchildren. We now know that to be untrue: it is axiomatic that discriminating against students on the basis of race "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483, 494 (1954).

I see little distinction between the message sent to Black children denied equal treatment in education under the doctrine of "separate but equal" and transgender children relegated to the "alternative appropriate private facilit[ies]" provided for by the Board's policy. The import is the same: "the affirmation that the very being of a people is inferior." Martin Luther King, Jr., "The Other America," Remarks Given at Stanford University (Apr. 14, 1967) (transcript available at https://www.rev.com/blog/transcripts/the-other-america-speech-transcript-martin-luther-king-jr); *see also Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3rd Cir. 2018), *cert. denied*, 139 S. Ct. 2636 (2019) (holding that a policy forcing transgender students to use separate single-user facilities "would very publicly brand all transgender students with a scarlet 'T,' and they should not have to endure that as the price of attending their public school").

70

Judge Niemeyer in dissent notes that Title IX and equal protection permit separate but equal accommodations in schools on a male/female basis. Niemeyer Dis. Op. at 93-94. But that observation says nothing about what happened in this case: separation of transgender students from their cisgender counterparts through a policy that ensures that transgender students may use *neither* male nor female bathrooms due to the incongruence between their gender identity and their sex-assigned-at-birth. That segregation generates harmful stigma, which was exacerbated in this case by the fact that the facilities were separate, but not even equal—there were no single-stall restrooms at football games, and the single-stall restrooms in the school building were located much farther from Grimm's classes than the boys' and girls' restrooms.

Moreover, it is important to note that the harm arising from the policy's message— that transgender students like Grimm should exist only at the margins of society, even when it comes to basic necessities like bathrooms—although foreign to the experiences of many, is not hypothetical. Nor does the policy merely engender discomfort or embarrassment for transgender students. Instead, the pain is overwhelming, unceasing, and existential. In an experience all too common for transgender individuals (particularly children), early in his junior year at Gloucester High, Grimm was hospitalized for suicidal thoughts resulting from being in an environment of "unbearable" stress where "every single day, five days a week" he felt "unsafe, anxious, and disrespected." Gavin Grimm Decl. ¶ 54.

Furthermore, putting aside the specific harm to Grimm, the Board's policy perpetuates a harmful and false stereotype about transgender individuals; namely, the "transgender predator" myth, which claims that students (usually male) will pretend to be

transgender in order to gain access to the bathrooms of the opposite sex—thus jeopardizing student safety. Indeed, the policy expresses concern that the presence of transgender students in school bathrooms endangers students. Although not relied upon by the Board on appeal, one of the policy's stated purposes is to "provide a safe learning environment for all students." J.A. 775.

The "transgender predator" myth echoes similar arguments used to justify segregation along racial lines. In the 1950s, segregationists spread false rumors that Black women would spread venereal diseases to toilet seats, and that Black men would sexually prey upon white women if public swimming pools were integrated. *See* Br. of NAACP 13-14, 16-17. Although history eventually proved the lie of such claims, the injustice was severe.

Even more recently, privacy concerns similar to those championed by the Board were invoked by opponents of gay and lesbian equality. These opponents argued that such individuals, especially gay men, must not be allowed to come into contact with young children or adolescents. They justified such claims by pointing either to a supposed uncontrollable, predatory sexual attraction among gay men toward children, or to an insidious desire to convert young people to an immoral (which is to say, non-heterosexual) lifestyle. *See id.* at 21-22 (citing *Lawrence v. Texas*, 539 U.S. 558, 602 (2003) (Scalia, J., dissenting) ("Many Americans do not want persons who openly engage in homosexual conduct as . . . scoutmasters for their children [or] as teachers in their children's schools[.]")).

The "transgender predator" myth—although often couched in the language of ensuring student privacy and safety—is no less odious, no less unfounded, and no less harmful than these race-based or sexual-orientation-based scare tactics. As one of our sister Circuits noted during the era of racial segregation: "[t]he law can never afford to bend in this direction again. The Constitution of the United States recognizes that every individual . . . is considered equal before the law. As long as this principle is viable, full equality of educational opportunity must prevail over theoretical sociological and genetical arguments which attempt to persuade to the contrary." *Haney v. Cnty. Bd. of Educ. of Sevier Cnty.*, 410 F.2d 920, 926 (8th Cir. 1969).

### III.

In sum, the picture that emerges from this case is damning.

The Board drafted a policy so arbitrary that it cannot provide consistent treatment among the very individuals it discriminates against. In so doing, the Board pursued shifting and ends-driven definitions of "biological gender" that guaranteed a particular outcome: that one student would be unable to use the boys' restroom. The policy bears an eerie similarity to stigmatic discrimination in the separate-but-equal context—which produces deeply corrosive, irreversible harm across a human life. Against that injury to Grimm, the Board offers a set of purported privacy injuries that *have not occurred*, while ignoring concomitant greater harms that would have resulted were Grimm to have followed the policy and used female school restrooms. And most tellingly, when Grimm attempted to comply with the policy by submitting an updated birth certificate, the Board resorted to procedural roadblocks.

73

In light of this history, I have little difficulty concluding that the Board's policy is orthogonal to its stated justifications. Far from ensuring student privacy, it has been applied to marginalize and demean Grimm for the mere fact that he, like other transgender individuals, is different from most. Even worse, it did so to a child at school.

Common experience teaches that high school is a challenging environment, in which every child perceives significant pressure to belong within their peer group while also defining their own personal identity and sense of self. Even the most trivial differences from others may take on outsized significance to an adolescent. How harrowing it must be for transgender individuals like Grimm to navigate that fraught setting while facing an unceasing daily reminder that they are not wanted, and that circumstances for which they are blameless render them members of a second class.

Of course, deriding those who are different—whether due to discomfort or dislike—is not new. But the Constitution's guarantee of equal protection prohibits the law from countenancing such discrimination. "The Constitution cannot control such [private] prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) (holding that policies enacted with "a bare . . . desire to harm a politically unpopular group" cannot be upheld under equal protection (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973))).

For that reason, I disagree with Judge Niemeyer's assertion that the panel majority attempts to "effect policy rather than simply apply law." Niemeyer Dis. Op. at 95. That

argument is meritless because "[t]he Nation's courts are open to injured individuals who come to them to vindicate their own direct, personal stake in our basic charter. An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015). Ensuring the Constitution's mandate of equal protection is satisfied for marginalized and minority groups, separate from the "vicissitudes of political controversy," is one of our most vital and solemn duties. *Id.* at 2606 (quoting *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 638 (1943)).

Discrimination like that faced by Grimm has reared its ugly head throughout American history. Yet, for most Americans, time has rendered it an embarrassment to the legacies of the individuals inflicting it. With that observation, I join in the thorough and well-reasoned opinion of my colleague, Judge Floyd.

NIEMEYER, Circuit Judge, dissenting:

Gavin Grimm, a transgender male, commenced this action in 2015 while a student attending Gloucester High School in Gloucester, Virginia, to require the school to permit him to use the male restrooms. The High School provided male restrooms and female restrooms and, under school policy, "limited [those restrooms] to the corresponding biological genders." It also provided unisex restrooms and made them available to everyone, with the particular goal of accommodating transgender students. In his complaint, Grimm contended that the High School's policy discriminated against him "based on his gender," in violation of the Equal Protection Clause of the Fourteenth Amendment, and "on the basis of sex," in violation of Title IX. He sought among other things injunctive relief requiring the High School "to allow [him] to use the boys' restrooms at school." After graduating from the High School, Grimm filed a second amended complaint, seeking only declaratory relief and nominal damages.

Contrary to Grimm's claim, Title IX and its regulations explicitly authorize the policy followed by the High School. While the law prohibits discrimination on the basis of sex in the provision of educational benefits, it allows schools to provide "separate living facilities for the different sexes," 20 U.S.C. § 1686, including "toilet, locker room, and shower facilities," 34 C.F.R. § 106.33. Gloucester High School followed these provisions precisely, going yet further by providing unisex restrooms for those not wishing to use the restrooms designated on the basis of sex. Moreover, in complying with Title IX, which Grimm has not challenged as unconstitutional, the High School did not deliberately discriminate against him in violation of the Equal Protection Clause of the Fourteenth

Amendment.  To the contrary, the High School's classifications for restroom usage —
which accord with longstanding and widespread practice — were appropriately justified
by the needs of individual privacy, as has been recognized by law.  At bottom, Gloucester
High School reasonably provided separate restrooms for its male and female students and
accommodated transgender students by also providing unisex restrooms that any student
could use.  The law requires no more of it.

The majority opinion, pursuing the public policy that it deems best, rules that
separating restrooms on the basis of biological sex is discriminatory.  In doing so, it
overlooks altogether and therefore does not address the reasons for such separation.
Rather, it blithely orders that the High School allow both transgender males and biological
males to use the same restrooms, thus abolishing any separation of restrooms on the basis
of biological sex.  Indeed, its ruling that male includes transgender males and likewise that
female includes transgender females renders on a larger scale any separation on the basis
of sex nonsensical.  In effect, the majority opinion does no more than express disagreement
with Title IX and its underlying policies, which is not, of course, the role of courts tasked
with deciding cases and controversies.

I cast no doubt on the genuineness of Gavin Grimm's circumstances, and I
empathize with his adverse experiences.  But judicial reasoning must not become an
outcome-driven enterprise prompted by feelings of sympathy and personal views of the
best policy.  The judiciary's role is simply to construe the law.  And the law, both statutory
and constitutional, prohibits discrimination only with respect to those who are *similarly*
situated.  Here, Grimm was born a biological female and identifies as a male, and therefore

his circumstances are different from the circumstances of students who were born as biological males. For purposes of restroom usage, he was not similarly situated to students who were born as biological males.

Accordingly, I would conclude that Grimm's complaint failed to state a claim on which relief can be granted.

I

At birth, Grimm was identified as female, and there was concededly no ambiguity about his sex. Thus, when it came time to enroll him in the Gloucester County School System, Grimm's parents indicated that he was female.

Beginning at an early age, however, Grimm "saw [himself] as a boy" and "did not want to be perceived as feminine in any way." At around the age of 12, he started presenting himself as a boy. He got a traditional male haircut, wore clothing exclusively from the boys' section of stores, and eventually began using a compression garment to flatten his developing breasts. Around the time of his 15th birthday, in the spring of 2014, Grimm came out to his parents as a transgender boy and, at his request, began therapy with a psychologist. His psychologist diagnosed him with "gender dysphoria," a condition of clinically significant distress experienced by some transgender people resulting from the incongruence between the gender with which they identify and their sex as identified at birth. Soon thereafter, Grimm obtained a court order legally changing his name from the female name he was given at birth to Gavin Elliot Grimm.

78

In advance of his 10th grade year, Grimm and his mother met with a guidance counselor at the High School to explain that Grimm was transgender and intended, as part of his treatment for gender dysphoria, to socially transition at school.  Both Grimm and his mother found the school counselor to be supportive.  The High School changed its records to reflect Grimm's new name, and Grimm and the school counselor agreed that Grimm would send an email to his teachers explaining that he was to be addressed by his new male name and referred to by male pronouns.  Grimm chose to continue completing his physical education classes through an online program so he did not need to use the school's locker rooms.  And with respect to restrooms, he and the school counselor agreed that he could use a private restroom in the nurse's office.

As the school year began, however, Grimm found that using the separate restroom was stigmatizing as well as inconvenient, causing him at times to be late for classes.  After a few weeks, he expressed his concerns to the Principal and asked for permission to use the male restrooms instead.  The Principal gave Grimm permission to do so.  But within a few days, school officials began receiving complaints from parents, and a student met with the Principal to express his concerns.  These members of the school community felt strongly that allowing a student with female anatomical features to use the male restrooms would infringe on the privacy interests of the male students.

In response to this input from the community, the Gloucester County School Board conducted public meetings, after which it adopted the following policy:

> Whereas the [Gloucester County Public Schools ("GCPS")] recognizes that some students question their gender identities, and

> Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and
>
> Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore
>
> It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.

Following adoption of the policy, the Principal advised Grimm that he was no longer permitted to use the High School's male restrooms. And about a week later, the school completed construction of three single-stall, unisex restrooms that were made available to all students.

Grimm felt stigmatized by the new policy and chose not to use the new unisex restrooms. He also felt uncomfortable using the female restrooms. As a result, he tried to avoid the use of restrooms at school, and when he could not avoid doing so, he used the restroom in the nurse's office. Nonetheless, he felt that by doing so, he called attention to his transgender status, making him uncomfortable.

At the end of Grimm's 11th grade year, when he was 17 years old, Grimm underwent a chest reconstruction surgery as part of his treatment for gender dysphoria. He also continued hormone therapy, which he had begun more than a year earlier and which deepened his voice, caused him to grow facial hair, and gave him a more masculine appearance overall.

Near the start of his 12th grade year in 2016, the Gloucester County Circuit Court granted Grimm's petition for an order directing the State Registrar to amend his birth

certificate.  Pursuant to that order, the Registrar issued a birth certificate to Grimm that listed his sex as male.  Thereafter, Grimm requested that the High School change the gender listed on his school records to conform to his new birth certificate.  Pursuant to the advice of counsel, the School Board advised Grimm that it had decided not to change the official school records.  Grimm graduated from the High School in June 2017.

*     *     *

In June 2015, at the end of his 10th grade year, Grimm commenced this action against the Gloucester County School Board, alleging that the School Board's policy of assigning students to male and female restrooms based on their biological sex rather than their gender identity violated his rights under the Equal Protection Clause of the Fourteenth Amendment and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. Among other things, he sought a preliminary and permanent injunction requiring the School Board to allow him to use the male restrooms at the school.

The district court granted the School Board's motion to dismiss Grimm's Title IX claim for failure to state a claim, relying primarily on a regulation implementing the statute that expressly permits schools to provide "separate toilet, locker room, and shower facilities on the basis of sex."  34 C.F.R. § 106.33.  The court also denied Grimm's motion for a preliminary injunction.

On appeal from the denial of the injunction, we reversed the district court's order and remanded the case.  *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016).  We reasoned that the Title IX regulation permitting schools to provide separate restrooms and other similar facilities for male and female students was ambiguous

81

with respect to "how a school should determine whether a transgender individual is a male or female for the purpose of access to [these] sex-segregated" facilities. *Id.* at 720. We then relied on a guidance document issued by the U.S. Department of Education stating that schools were generally required to "treat transgender students consistent with their gender identity," *id.* at 718, and concluded that the interpretation was "entitled to *Auer* deference and . . . controlling weight," *id.* at 723. In addition, we vacated the district court's order denying a preliminary injunction, concluding that the court had used the wrong evidentiary standard in evaluating Grimm's motion. *Id.* at 724–26.

The School Board filed a petition for a writ of certiorari in the Supreme Court, as well as a motion for a stay of our judgment. During the same period, the district court, based on our analysis, granted Grimm's motion for a preliminary injunction. The Supreme Court, however, stayed the district court's preliminary injunction, *see* 136 S. Ct. 2442 (Aug. 3, 2016), and it subsequently granted the School Board's certiorari petition, *see* 137 S. Ct. 369 (Oct. 28, 2016).

While the case was pending before the Supreme Court, a new Administration rescinded the previously issued guidance document regarding transgender students, which prompted the Supreme Court to vacate our April 2016 decision and to remand the case to us for further consideration. *See* 137 S. Ct. 1239 (Mar. 6, 2017). We, in turn, granted an unopposed motion to vacate the district court's preliminary injunction. *See* 853 F.3d 729 (4th Cir. 2017).

After Grimm graduated from high school, he withdrew his request for a preliminary injunction and filed an amended complaint that continued to challenge the legality of the

School Board's restroom policy as applied to transgender students, seeking a permanent injunction, declaratory relief, and nominal damages. But after the district court requested supplemental briefing regarding mootness in light of Grimm's graduation, Grimm agreed to dismiss his requests for prospective relief. He argued, however, that his graduation did not moot his challenge to the legality of the School Board's restroom policy because he was seeking only a retrospective remedy in the form of nominal damages and declaratory relief. The district court agreed.

Thereafter, in a memorandum opinion and order dated May 22, 2018, the district court denied the School Board's motion to dismiss Grimm's amended complaint for failure to state a claim, concluding that Grimm had plausibly alleged that, by excluding him from the set of restrooms that corresponded to his gender identity, the School Board had subjected him to discrimination on the basis of sex, in violation of Title IX, and had also discriminated against him in violation of the Equal Protection Clause. *Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730 (E.D. Va. 2018).

Roughly nine months later, the district court granted Grimm's motion to file a second amended complaint, which, for the first time, alleged that the School Board's decision not to change the gender listed on Grimm's school records from female to male also constituted a violation of Title IX and the Equal Protection Clause.

After completing discovery, the parties filed cross-motions for summary judgment. By order dated August 9, 2019, the district court granted Grimm's motion and denied the School Board's motion. *See Grimm v. Gloucester Cty. Sch. Bd.*, 400 F. Supp. 3d 444 (E.D. Va. 2019). For relief, the court (1) entered a declaratory judgment "that the Board's policy

violated Mr. Grimm's rights under the Fourteenth Amendment . . . and Title IX . . . on the day the policy was first issued and throughout the remainder of his time as a student at Gloucester High School;" (2) entered a declaratory judgment "that the Board's refusal to update Mr. Grimm's official school transcript to conform to the 'male' designation on his birth certificate violated and continues to violate his rights under the Fourteenth Amendment . . . and Title IX"; (3) awarded Grimm nominal damages "in the amount of one dollar"; (4) entered a permanent injunction "requiring the Board to update Mr. Grimm's official school records to conform to the male designation on his updated birth certificate"; and (5) awarded Grimm "reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988."

From the district court's order, the School Board filed this appeal.

## II

At the heart of his claim, Grimm contends that in denying him, as a transgender male, permission to use the male restrooms because those restrooms were designated for biologically male students, Gloucester High School discriminated against him "on the basis of sex," in violation of Title IX and the Equal Protection Clause. This claim does not challenge the High School's provision of separate restrooms but rather asserts that treating transgender males differently than biological males in permitting access to those restrooms constitutes illegal discrimination. This argument thus rests on the proposition that transgender males and biological males are similarly situated with respect to using male restrooms.

The School Board, however, determined that the physical differences between transgender males and biological males were material with respect to the use of restrooms and locker rooms, and accordingly it provided unisex restrooms in addition to its male and female restrooms to accommodate transgender persons such as Grimm.  In having done so, the School Board maintains that it complied fully with Title IX and its implementing regulations, which, while prohibiting discrimination on the basis of sex in any education program or activity, nonetheless expressly allow educational institutions receiving federal assistance to provide separate restrooms for the different sexes.

I agree with the School Board's position.  Any requirement that schools treat male, female, and transgender students differently from the way the High School treated them would be a matter for Congress to address.  But, until then, the High School comported with what both Title IX and the Equal Protection Clause require.  I begin with Title IX.

## III

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  But the statute contains several exceptions to its nondiscrimination provision, one of which specifies that "[n]otwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, *from maintaining separate living facilities for the different sexes*."  *Id.* § 1686 (emphasis added).  And the applicable regulations give further detail,

85

permitting schools to provide "separate housing on the basis of sex," as long as the housing is "[p]roportionate" and "[c]omparable," 34 C.F.R. § 106.32(b), and "separate toilet, locker room, and shower facilities on the basis of sex," so long as the facilities "provided for students of one sex shall be comparable to such facilities provided for students of the other sex," *id.* § 106.33. We must therefore determine what it means to provide separate toilet, locker room, and shower facilities *on the basis of sex* in a situation where a student's gender identity diverges from the sex manifested by the student's biological characteristics.

As several sources make clear, the term "sex" in this context must be understood as referring to the traditional biological indicators that distinguish a male from a female, not the person's internal sense of being male or female, or their outward presentation of that internally felt sense.

Title IX was enacted in 1972, and its implementing regulations were promulgated shortly thereafter. And during that period of time, virtually every dictionary definition of "sex" referred to the *physiological* distinctions between males and females — particularly with respect to their reproductive functions. *See, e.g.*, *The Random House College Dictionary* 1206 (rev. ed. 1980) ("either the male or female division of a species, esp. as differentiated with reference to the reproductive functions"); *Webster's New Collegiate Dictionary* 1054 (1979) ("the sum of the structural, functional, and behavioral characteristics of living beings that subserve reproduction by two interacting parents and that distinguish males and females"); *American Heritage Dictionary* 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions"); *Webster's Third New International Dictionary* 2081 (1971) ("the sum of the

morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change . . ."); *The American College Dictionary* 1109 (1970) ("the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished . . ."). Indeed, even today, the word "sex" continues to be defined based on the physiological distinctions between males and females. *See, e.g.*, *Webster's New World College Dictionary* 1331 (5th ed. 2014) ("either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions"); *The American Heritage Dictionary* 1605 (5th ed. 2011) ("Either of the two divisions, designated female and male, by which most organisms are classified on the basis of their reproductive organs and functions"); *Merriam-Webster's Collegiate Dictionary* 1140 (11th ed. 2011) ("either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male esp. on the basis of their reproductive organs and structures").

Given this uniformity in dictionary definitions, it is no surprise that, in the context of interpreting Title VII's nondiscrimination provision enacted in 1964, the Supreme Court's recent decision in *Bostock v. Clayton County* relied on this same understanding of the word "sex." To be sure, the *Bostock* Court determined that its resolution of the parties' dispute did not require it to determine definitely the meaning of the term. *See Bostock*, 140 S. Ct. 1731, 1739 (2020). But its analysis proceeded on the assumption that, in 1964, the term sex "referr[ed] only to biological distinctions between male and female" and did not include "norms concerning gender identity." *Id.*

87

Moreover, that the word "sex" in Title IX refers to biological characteristics, not gender identity, becomes all the more plain when one considers the privacy concerns that explain why, in the first place, Title IX and its regulations allow schools to provide separate living facilities, restrooms, locker rooms, and shower facilities "on the basis of sex." *See* 20 U.S.C. § 1686; 34 C.F.R. §§ 106.32(b), 106.33. To state the obvious, what bathroom, locker room, shower, and living facilities all have in common is that they are places where people are, at some point, in a state of partial or complete undress to engage in matters of highly personal hygiene. An individual has a legitimate and important interest in bodily privacy that is implicated when his or her nude or partially nude body is exposed to others. And this privacy interest is significantly heightened when persons of the opposite biological sex are present, as courts have long recognized. *See, e.g.*, *Doe v. Luzerne Cty.*, 660 F.3d 169, 176–77 (3d Cir. 2011) (recognizing that an individual has "a constitutionally protected privacy interest in his or her partially clothed body" and that this "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex"); *Brannum v. Overton Cty. Sch. Bd.,* 516 F.3d 489, 494 (6th Cir. 2008) (explaining that "the constitutional right to privacy . . . includes the right to shield one's body from exposure to viewing by the opposite sex"); *Sepulveda v. Ramirez,* 967 F.2d 1413, 1416 (9th Cir. 1992) (explaining that "[t]he right to bodily privacy is fundamental" and that "common sense, decency, and [state] regulations" require recognizing it in a parolee's right not to be observed by an officer of the opposite sex while producing a urine sample); *Lee v. Downs,* 641 F.2d 1117, 1119 (4th Cir. 1981) (recognizing that, even though inmates in prison "surrender many rights of privacy," their "special sense of privacy in

88

their genitals" should not be violated through exposure unless "reasonably necessary" and explaining that the "involuntary exposure of [genitals] in the presence of people of the other sex may be especially demeaning and humiliating"). Moreover, these privacy interests are broader than *the risks of actual* bodily exposure. *They include the intrusion created by mere presence*. In short, we want to be alone — to have our privacy — when we "shit, shower, shave, shampoo, and shine."

In light of the privacy interests that arise from the physical differences between the sexes, it has been commonplace and universally accepted — across societies and throughout history — to separate on the basis of sex those public restrooms, locker rooms, and shower facilities that are designed to be used by multiple people at a time. Indeed, both the Supreme Court and our court have previously indicated that it is this type of physiological privacy concern that has led to the establishment of such sex-separated facilities. *See United States v. Virginia*, 518 U.S. 515, 533, 550 n.19 (1996) (recognizing that "[p]hysical differences between men and women" are "enduring" and render "the two sexes . . . not fungible" and acknowledging, when ordering an all-male Virginia college to admit female students, that such a remedy "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex" (cleaned up)); *Faulkner v. Jones,* 10 F.3d 226, 232 (4th Cir. 1993) (noting "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns").

In short, the physical differences between males and females and the resulting need for privacy is what the exceptions in Title IX are all about.

The issue in this case arises from the fact that Grimm is a transgender male who was born a biological female.  Thus, we must determine in this context what it means to provide him separate toilet, locker room, and shower facilities on the basis of sex.  Grimm does not challenge the constitutionality of Title IX or the legitimacy of its regulations, nor does he challenge the statute's underlying policy interests.  He argues simply that because he identifies as male, he must be allowed to use the male restrooms and that denying him that permission discriminates against him on the basis of his sex.

Grimm's argument, however, is facially untenable.  While he accepts the fact that Title IX authorizes the separation of restrooms — indeed, he seeks to use the male restrooms so separated from female restrooms — the implementation of his position would allow him to use restrooms contrary to the basis for separation.  Gloucester High School maintains male restrooms, female restrooms, unisex restrooms, and under its policy, Grimm would be entitled to use either the female or the unisex restrooms.  But requiring the school to allow him, a biological female who identifies as male, to use the male restroom compromises the separation as explicitly authorized by Title IX.

Seeking to overcome this logical barrier, the majority maintains that the School Board applied "its own discriminatory notions of what 'sex' means."  *Ante* at 56.  But the School Board did no such thing.  In implementing its policy, it relied on the commonly accepted definition of the word "sex" as referring to the anatomical and physiological differences between males and females and concluded that, for purposes of access to its sex-separated facilities, Grimm's sex remained female during the time he was a student at Gloucester High School.

Not to be persuaded, the majority further states that the regulation permitting schools to provide separate toilets on the basis of sex "cannot override the statutory prohibition against *discrimination* on the basis of sex." *Ante* at 56. But strikingly, this overlooks the fact that Congress expressly provided *in the statute* that nothing in its prohibition against discrimination "shall be construed to prohibit" schools "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. The majority's oversight can only be taken as a way to reach conclusions on how schools *should* treat transgender students, rather than a determination of what the statute requires of them.

In short, Gloucester High School did not deny Grimm suitable restrooms. It created three new unisex restrooms that allowed him, as well as the other students, the privacy protected by separating bathrooms on the basis of sex.

IV

Grimm also contends that, even if the School Board did not discriminate against him on the basis of sex in violation of Title IX, it discriminated against him in violation of the Equal Protection Clause of the Fourteenth Amendment. He does so without arguing that Title IX violates the Equal Protection Clause in allowing educational institutions to separate restrooms on the basis of sex.

The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. As long recognized by the Supreme Court, the Clause is "essentially a direction that all persons *similarly situated* should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*,

473 U.S. 432, 439 (1985) (emphasis added).  In this manner, the provision "simply keeps governmental decisionmakers from treating differently persons *who are in all relevant respects alike*." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis added).  As such, a plaintiff asserting a violation of the Equal Protection Clause must "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (noting that the Equal Protection Clause "secure[s] every person within the State's jurisdiction against intentional and arbitrary discrimination" (cleaned up)).

In general, a state-created classification will be "presumed to be valid and will be sustained if [it] is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440.  The Supreme Court has recognized, however, that legislative classifications based on sex "call for a heightened standard of review." *Id.*  Thus, when state actors treat people differently on the basis of sex, they must show "that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (cleaned up).  "The justification must be genuine," and it may not "rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.*  Nonetheless, "[t]o fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001).

Here, Grimm appears to acknowledge that a public school may, consistent with the Equal Protection Clause, establish one set of restrooms for its male students and another set for its female students, as long as the two sets of facilities are comparable — a "separate but equal" arrangement that would obviously be unconstitutional if the factor used to assign students to restrooms was instead race.  And the reason it is constitutional for a school to provide separate restrooms for its male and female students — but not, for example, to its Black and White students — is because there are biological differences between the two sexes that are relevant with respect to restroom use in a way that a person's skin color is demonstrably not.  As noted above, all individuals possess a privacy interest when using restrooms or other spaces in which they remove clothes and engage in personal hygiene, and this privacy interest is heightened when persons of the opposite sex are present.  Indeed, this privacy interest is heightened yet further when children use communal restrooms and similar spaces, because children, as the School Board notes, "are still developing, both emotionally and physically."

It is thus plain that a public school may lawfully establish, consistent with the Constitution, separate restrooms for its male and female students in order to protect bodily privacy concerns that arise from the anatomical differences between the two sexes.  In light of this rationale, Grimm cannot claim that he was discriminated against when he was denied access to the male restrooms because he was not, in fact, similarly situated to the biologically male students who used those restrooms.  While he no doubt identifies as male and also has taken the first steps to transition his body, at all times relevant to the events in this case, he remained anatomically different from males.  Because such anatomical

differences are at the root of why communal restrooms are generally separated on the basis of sex, I conclude that by adopting a policy pursuant to which Grimm was not permitted to use male student restrooms, the School Board did not "treat[] differently persons who are in all *relevant* respects alike," *Nordlinger*, 505 U.S. at 10 (emphasis added), and therefore did not violate the Equal Protection Clause. And there is no claim or evidence in the record that Grimm was treated differently from any other transgender student.

In reaching the opposite conclusion, the majority imputes to the School Board an illegal bias based *solely* on the decision it made to separate restrooms. It reasons that "[t]he overwhelming thrust of everything in the record . . . is that Grimm was similarly situated to other boys" with respect to the use of restroom facilities, and it further asserts that, by "privileg[ing] sex-assigned-at-birth over Grimm's medically confirmed, persistent and consistent gender identify," the School Board revealed "its own bias." *Ante* at 38–39. But in employing such an analysis, the majority fails to address why it is permissible for schools to provide separate restrooms to their male and female students to begin with. Such consideration would have demonstrated that it was not "bias" for a school to have concluded that, in assigning a student to either the male or female restrooms, the student's biological sex was relevant.

At bottom, I conclude that the School Board, in denying Grimm the use of male restrooms, did not violate the Equal Protection Clause.

*    *    *

The majority opinion devotes over 20 pages to its discussion of Grimm's transgender status, both at a physical and psychological level. Yet, the mere fact that it felt necessary to do so reveals its effort to effect policy rather than simply apply law.

I readily accept the facts of Grimm's sex status and gender identity and his felt need to be treated with dignity. Affording all persons the respect owed to them by virtue of their humanity is a core value underlying our civil society. At the same time, our role as a court is limited. We are commissioned to apply the law and must leave it to Congress to determine policy. In this instance, the School Board offered its students male and female restrooms, legitimately separating them on the basis of sex. It also provided safe and private unisex restrooms that Grimm, along with all other students, could use. These offerings fully complied with both Title IX and the Equal Protection Clause.

Accordingly, I would reverse and remand with instructions to dismiss Grimm's complaint.